**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRETT MESSIEH and DREW LEE, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | No. _____ |
| v. | |
| HDR GLOBAL TRADING LIMITED, ABS GLOBAL TRADING LIMITED, ARTHUR HAYES, BEN DELO, and SAMUEL REED, | **JURY DEMANDED** |
| Defendants. | |

## <u>CLASS ACTION COMPLAINT</u>

Individually and on behalf of all others similarly situated, Plaintiffs Brett Messieh and Drew Lee bring this action against Defendants HDR Global Trading Limited, ABS Global Trading Limited (together with HDR Global Trading Limited, "BitMEX"), Arthur Hayes, Ben Delo, and Samuel Reed.  Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, expert analysis of publicly disclosed reports and information about Defendants.  Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and can be discovered after a reasonable opportunity for discovery.  Plaintiffs hereby allege as follows:

## I.   **INTRODUCTION**

1.      On behalf of a class of investors (the "Class") who purchased securities and commodities futures that BitMEX sold in domestic U.S. transactions through its exchange since March 10, 2017 (the "Class Period"), Plaintiffs and members of the Class seek to recover the damages suffered from Defendants' unlawful actions, the consideration they paid for the products, and the fees they paid to BitMEX in connection with their purchases.

2.      BitMEX is one of the largest crypto-asset exchanges in the world, with a daily trading volume that regularly surpassed $3 billion in January 2020.  The BitMEX exchange exclusively trades derivative products based on crypto-assets, predominately bitcoin and ether. Unfortunately for investors, the exchange was rigged, and behind the scenes BitMEX was manipulating both its systems and the market it made so BitMEX could turn outsized profits at the expense of its own customers.

3.      As BitMEX's co-founder and CEO Defendant Arthur Hayes described it, BitMEX was initially conceived to serve Wall Street institutional investors "who were going to want the

same type of products" they were used to trading at sophisticated multinational banks. Yet for the first six months after BitMEX went live in late 2014, "no one came" to the trading platform. And Wall Street never came to BitMEX. So, in Hayes's own words, BitMEX changed its business model to "focus[] on degenerate gamblers; [also known as] retail investors" and luring the "degenerate[s]" in by offering eye-popping "100X leverage" trades. But BitMEX never disclosed that the dice at its virtual casino were loaded in the house's favor.

4.      By allowing customers to leverage at the extraordinary ratio of 100:1—about twenty times higher than the common ratio in trading—BitMEX positioned itself to benefit consistently, significantly, and predictably. Specifically, the combination of a customer base willing to enter into extremely high-leverage trades and small price fluctuations on other exchanges, which quickly caused these leveraged trades to liquidate, has yielded BitMEX a steady stream of profit.

5.      BitMEX maintained a policy where it would automatically liquidate contracts that were out of the money, generally at a profit to itself. When it liquidated a contract, BitMEX would cover the investor's losses but would also seize all of the investor's collateral. By setting the liquidation point higher than necessary to protect against the risk of a loss greater than the investor's collateral, BitMEX generally profited from these liquidations. BitMEX would place these profits in its so-called "Insurance Fund," which was marketed as a way to ensure that BitMEX has cash on hand for the occasions where an investor's losses exceeded their collateral.

6.      Yet the Insurance Fund serves less as insurance than as a source of enormous profit for BitMEX—as it is rarely drawn upon and has instead, through BitMEX's manipulations, grown steadily to be worth hundreds of millions of dollars. The Insurance Fund grew particularly quickly

during periods of high volatility, as more customers' positions were liquidated.  It has grown out of proportion with the possible losses against which it is purportedly intended to insure.

7.      BitMEX has increased the profitability of the Insurance Fund by routinely freezing its servers—which BitMEX blames on technical glitches and limitations even though its competitors do not experience similar freezes and these freezes cannot be justified by trading volume—to profit during moments of high volatility.  During these freezes, customers are locked out of their accounts and unable to change their positions, but the market continues to operate and BitMEX continues to liquidate positions based on the moving market.  BitMEX would thus prevent its customers from escaping positions until they fell to a level at which BitMEX could liquidate those positions at a further profit to itself.

8.      BitMEX's operations on March 12, 2020, are a recent and striking example.  As bitcoin's price plummeted from approximately $7,200 to under $4,000, resulting in a substantial sell-off, BitMEX's trading platform went offline for twenty-five minutes.  As a result of the outage, BitMEX liquidated *$700 million* of its customers' highly leveraged positions for its own profit.  As prices gradually recovered over the course of the day, BitMEX brought the exchange back online and sold off the positions it had liquidated during the crash, preventing any serious loss to the Insurance Fund.  This "server outage" effectively protected BitMEX and the Insurance Fund from the cascading effects of sell-offs of BitMEX's highly leveraged and volatile products, while also preventing its customers from protecting themselves from having their BitMEX positions liquidated.  In fact, the Insurance Fund hit an all-time high the very next day.

9.      BitMEX also traded against its customers, a secret BitMEX kept as long as it could.  BitMEX employed a trading desk with special privileges and insights that allowed BitMEX to trade against its own customers.  BitMEX only revealed the existence of this trading desk in 2018,

under pressure from an independent analyst armed with trade data reflecting its existence.  As a desk with access to otherwise-hidden information, it operates in a uniquely privileged position to enhance BitMEX's manipulation and illicit profits.

10.     BitMEX and those who have controlled its operations have thus manipulated and exploited their liquidation and trading systems, harming Plaintiffs and members of the Class who had their positions liquidated or who were disadvantaged through trades orchestrated by BitMEX's secret proprietary trading desk, in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq*.

## II.   **PARTIES**

### A.  **Plaintiffs**

11.     Plaintiff Brett Messieh is a resident of Tampa, Florida.  Mr. Messieh and members of the Class purchased derivative products within the United States on BitMEX and pursuant to contracts with BitMEX, during the Class Period.

12.     Plaintiff Drew Lee is a resident of New York, New York.  Mr. Lee and members of the Class purchased derivative products within the United States on BitMEX and pursuant to contracts with BitMEX, during the Class Period.

### B.  **Defendants**

13.     Defendant HDR Global Trading Limited ("HDR") launched in 2014.  By January 2017, it had become, and remains, the largest crypto-asset derivatives exchange in the world, with the highest trading volume of any such futures exchange.  HDR is incorporated in the Seychelles, with its principal office located at Global Gateway 8, Rue de la Perle, Providence Mahé, Seychelles.  HDR is the owner of the trading platform called BitMEX and operated BitMEX out of an office in Manhattan.

14.     ABS Global Trading Limited ("ABS") is a Delaware corporation created in 2017 and entirely owned by HDR.  It is registered to do business in New York.  According to public records, it is headquartered at 31 Conduit Road, Flat 17B, The Morgan, Hong Kong.  ABS is responsible for technical aspects of the BitMEX platform, including security services and implementing the user interface traders use to buy and sell products.  ABS and HDR refer to themselves collectively as "BitMEX."  They make job postings that do not differentiate between the companies, and employees identify themselves as working for BitMEX.  Both entities engage in sufficient marketing and technical work that necessarily touches upon every facet of BitMEX's operations, and critically, its manipulation.

15.     Defendant Arthur Hayes is the founder and CEO of both HDR and ABS.  Hayes is a United States citizen who grew up in New York and went to graduate school at the Wharton School of the University of Pennsylvania.  On information and belief, he resides in Hong Kong and frequently traveled to New York to manage BitMEX's local office, to obtain investments and promote BitMEX, including by speaking at conferences in New York City like the 2017 and 2018 Consensus Invest conferences.

16.     Defendant Samuel Reed is the Chief Technical Officer ("CTO") of both HDR and ABS and co-founded them along with Hayes.  On information and belief, he resides in Hong Kong.  As the chief "front-end" designer of BitMEX's platform, responsible for its appearance, upon information and belief Defendant Reed directs key operations of ABS.

17.     Defendant Ben Delo co-founded both HDR and ABS with Hayes and Reed.  As a mathematician, Defendant Delo is responsible for designing key trading systems implemented on the BitMEX platform, including the liquidation engine.  On information and belief, he resides in Hong Kong.

III.  **JURISDICTION AND VENUE**

18.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1331 because the Complaint asserts claims under the Commodity Exchange Act, 7 U.S.C. § 25(c).

19.     This Court has personal jurisdiction over Defendants as a result of acts of Defendants occurring in or aimed at the State of New York in connection with Defendants' manipulation of its exchange.  Throughout most, if not all, of the Class Period, BitMEX maintained an office in Midtown Manhattan and was recruiting individuals for this office on websites such as Linkedin.com, angel.co, and builtinnyc.com.  According to public profiles on LinkedIn, BitMEX has some employees in the greater New York City area.  BitMEX also regularly solicited employees for positions in the New York City area, including Vice President of Marketing and Digital Marketing Manager, illustrating a clear intent to maintain a presence in, and operate from, New York in marketing itself to United States and New York residents.  BitMEX retained in September 2019 the New York office of a public relations firm to popularize its platform.  In addition, BitMEX employees regularly speak and solicit business at large cryptography and blockchain conferences hosted in New York.  For example, Defendant Hayes spoke at CoinDesk's annual Consensus: Invest conference in New York in 2017 and 2018 to discuss new products, and other business development employees solicited business during the 2016 event in New York.

20.     Venue is proper pursuant to 7 U.S.C. §25(c) in that this is a district wherein any defendant is found, resides, or transacts business, or wherein any act or transaction constituting the violation occurred.  Beyond clear evidence of New York-based social media users regularly interacting with BitMEX, "[s]everal sources close to the company" have publicly disclosed that nearly 15 percent of BitMEX's 2019 trading volume—or about $138 billion—is attributable to traders located in the United States.  Although BitMEX claims not to allow users located within

the Unites States to trade on its platform, trading from the United States is in fact both possible and common because, as Defendant Hayes concedes, as journalists and other commentators have explained, and as BitMEX's marketing of itself in the United States demonstrates, accessing BitMEX is trivially easy from the United States using virtual private networks that purport to mask a trader's location.  BitMEX was well aware and promoted this behavior.  For example, one popular New York-based trader earned referral fees for generating 900 customer sign-ups for BitMEX using his public Twitter account.

**IV.    FACTUAL ALLEGATIONS**

###### A. Crypto-Assets And The Operation Of BitMEX

######## 1.    An Introduction To Digital Assets

21.    This case involves the sale of crypto-assets, *i.e.*, digital assets designed to work as a medium of exchange, a store of value, or both.  Crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

22.    Bitcoin was the world's first decentralized crypto-asset.  It is also the largest and most popular crypto-asset, with a market capitalization of approximately $132 billion as of 10:00 a.m. EDT on April 23, 2020.  Bitcoin spawned a number of other crypto-assets that, together with bitcoin, have a current market capitalization of $208 billion as of 10:00 a.m. EDT on April 23, 2020.  (The term "bitcoin" can refer to both a computer protocol and a unit of exchange.  Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

23.    At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence.  This ledger is called the blockchain.

24.     Blockchains act as the central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

25.     Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network.  In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources, which has the effect of making the blockchain more accurate and secure.  For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted bitcoin.  This process is colloquially referred to as "mining."

26.     Mining is one method by which an individual can acquire crypto-assets like bitcoin. A second and more common manner is to obtain crypto-assets from someone else.  This is often accomplished by acquiring it through an online "cryptocurrency exchange."

27.     Online cryptocurrency exchanges are one place to purchase bitcoin and other crypto-assets.  These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies.

28.     For a time, bitcoin was the only crypto-asset available on exchanges.  As crypto-assets grew in popularity, exchanges began listing other crypto-assets as well, and trading volumes expanded.  In early 2013, daily bitcoin trading volumes hovered between $1 million and $25 million.  By the end of 2017, daily bitcoin trading volumes ranged between $200 million and $3.8 billion.

29.     In September 2015, the Commodity Futures Trading Commission ("CFTC") designated bitcoin a commodity.

30.     Ethereum is the second-most popular crypto-asset, with a market capitalization of approximately $20.5 billion as of billion as of 10:00 a.m. EDT on April 23, 2020.  The Ethereum blockchain functions similarly to the Bitcoin blockchain insofar as its miners act as the validators of the network.  Miners of the Ethereum blockchain are paid for their services in the form of newly minted ether.  (The term "Ethereum" refers to the open software platform built on top of the Ethereum blockchain, while the term "ether" is the unit of account used to exchange value within the Ethereum "ecosystem," i.e., the overall network of individuals using Ethereum or participating in the development of its network.  This distinction is thus similar to the "Bitcoin" versus "bitcoin" distinction noted above.)  Like bitcoin, ether has been designated a commodity by the CFTC.

31.     By the end of 2016, interest in crypto-assets began to accelerate, with prices growing at a rate historically unprecedented for any asset class.  Over the course of 2017 alone, bitcoin's price increased from approximately $1,000 to approximately $20,000.  Ethereum's growth was even more startling.  On January 1, 2017, Ethereum was trading at approximately $8 per ether.  Approximately one year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

32.     In April 2013, there were only seven crypto-assets listed on coinmartketcap.com, a popular website that tracks the crypto-asset markets.  As of this filing, the site monitors more than 2,000 crypto-assets.

### 2.     The Origins Of BitMEX

33.     BitMEX does not sell bitcoin, ether, or any other digital asset.  Instead, BitMEX offers futures and swap products, which are tied to the future performance of these assets without requiring their direct ownership.  To use the platform, traders must first deposit bitcoin they have

obtained from another source.  Then they can use that bitcoin as collateral to trade contracts that reference bitcoin or other crypto-assets.

34.     BitMEX began offering derivative products for bitcoin in 2014 as one of the first players in the crypto-asset derivative space.  Early on, struggling to make money, the founders chose to, as they put it, "focus[] on degenerate gamblers; [also known as] retail investors."  Since then, its first-mover advantage has paid off:  it is consistently among the largest crypto-asset futures traders by volume and has been for years.  It now frequently trades over $3 billion worth of transactions in a single day.

35.     BitMEX's founder and CEO, Defendant Hayes, is the P.T. Barnum of the crypto-asset world.  Describing the trading of crypto-assets as "the entertainment business," he has embraced a role as showman and promotor for the so-called "degenerate gamblers" he solicits, and encourages speculative trading by flaunting his lavish lifestyle and making bold predictions designed to elicit responses and move the market to create profit for BitMEX and himself.

36.    Hayes repeatedly flaunts his wealth to followers of the BitMEX platform, while also sharing his positions and profits he makes by betting on the price of bitcoin and other crypto-assets.  The implication of these promotions is clear:  you too could live like this, if you trade on my platform.



37.    For example, when promoting BitMEX at Consensus 2018, a large conference in New York, Hayes flaunted his arrival in an exotic car:



38.    Like many promoters, Hayes takes extreme positions and uses aggressive language to draw interest and attention to his product.  For example, in July 2018, after the price of bitcoin crashed from $19,000 to below $6,000, Hayes predicted on national television that the price would reach $50,000 before the end of the year, encouraging traders to come to BitMEX.  While the price of bitcoin rose in the days following his pronouncement to over $8,000, it had fallen even farther by January 1, 2019, to below $4,000.

39.     Similarly, in advertising BitMEX Hayes has denigrated the digital tokens BitMEX "proudly" lists derivatives of, suggesting they are "dogshit" and "a shitcoin" even as he directs customers to come and trade derivatives of these products on BitMEX:



40.     The BitMEX platform also has casino-like features built in.  It promotes "winners" with a leaderboard of successful traders linked to on BitMEX's homepage:

## Top 25 Traders by Notional

| Rank | Name | Profit | Is Real Name |
|---|---|---|---|
| 1 | Quick-Grove-Mind | 8,047.8158 XBT | ✗ |
| 2 | Mercury-Wood-Sprite | 7,731.0973 XBT | ✗ |
| 3 | Heavy-Autumn-Wolf | 7,544.8921 XBT | ✗ |
| 4 | Alameda Research | 5,244.6841 XBT | ✓ |
| 5 | Hot-Relic-Fancier | 4,216.5159 XBT | ✗ |
| 6 | coincidentcapitalltd | 2,610.2783 XBT | ✓ |
| 7 | Jelly-Mint-Flier | 2,525.3227 XBT | ✗ |
| 8 | Skitter-Peridot-Raven | 2,343.9594 XBT | ✗ |
| 9 | Wheat-Storm-Speaker | 2,028.0849 XBT | ✗ |
| 10 | Honeysuckle-South-Rib | 2,011.3699 XBT | ✗ |

41.     BitMEX runs promotions for its products to promote gambling, providing prizes to "[t]he trader who continuously quotes the largest two-sided volume within a 0.5 percent spread" or "[t]he trader who has the largest profit (in XBT) from trading the NEO (NEOG18) contract."

42.     These promotions attract numerous retail investors and distract them from the fact that BitMEX created an exchange that facilitates its own manipulative and fraudulent behavior. Hayes himself has openly acknowledged the existence of such misconduct, stating that "[t]he digital token trading markets like traditional forex markets are not regulated, and will struggle to be.  Therefore, if you can't stomach insider trading, then don't take on short-term positions."

43.     Since its inception, BitMEX has flouted financial regulators worldwide for operating as an unregistered exchange, hiding behind its offshore status.

44.     In 2018, the financial regulator for the province of Quebec, Canada, ordered BitMEX to close accounts linked to customers in Quebec because it was operating as an unregistered exchange.

45.     In July 2019, according to reports, the CFTC opened an investigation to determine whether the exchange is targeting and allowing U.S. traders to use the platform despite claiming not to allow them, after numerous press reports detailed the lack of any "know your customer" practices at BitMEX and the ease with which users can access the site from the United States—indeed, one New York journalist has detailed his use of BitMEX.

46.     On March 3, 2020, the United Kingdom's Financial Conduct Authority issued a notice that BitMEX "is not authorised by us and is targeting people in the UK.  Based upon information we hold, we believe it is carrying on regulated activities which require authorisation."

47.     BitMEX's flouting of financial regulators is consistent with the lawless attitude of its founders, as Defendant Hayes has freely admitted to falsifying banking documentation in China in order to take advantage of arbitrage opportunities in the price of bitcoin.

**3.     Operation Of BitMEX And Its Derivatives Products**

48.     BitMEX is not the only entity that offers swaps and futures products on bitcoin. BitMEX, however, structures its products and operations with features more akin to a casino, focusing on products that expose customers to greater volatility and an increased risk of loss.

49.     One of BitMEX's earliest and still most popular products is the XBTUSD Perpetual Contract.  This product, with features that resemble both a future and a swap, allows traders to buy or sell a contract that tracks the price of the exchange rate between bitcoin and the U.S. Dollar.  If you buy the contract, you will make a profit if the price of bitcoin goes up in U.S. Dollars.

Conversely, if you sell the contract, you will make a profit if the price of bitcoin goes down in U.S. Dollars—effectively a short sale on the price of bitcoin.

50.     Unlike a typical futures contract, XBTUSD has no set expiry date.  Further, unlike a traditional futures product, the XBTUSD Perpetual Contract price closely tracks the price of the underlying asset, bitcoin.  Put differently, in a traditional futures market, there are separate prices for the futures product and for the underlying asset.  For example, if ACME Corp. is trading at $100 a share today, the contract to buy one share of ACME Corp. at $120 in three months might trade for $5.  By contrast, XBTUSD tracks the price of bitcoin by exchanging among contract holders that are long (or short) a "funding rate" every eight hours if the price of bitcoin is higher (or lower) than what the contract is trading for on BitMEX.  These mechanics incentivize buying the contract when the price of the contract is lower than the price of bitcoin, thus raising the contract's price, and vice-versa.  The "funding rate" amount depends on the spread between the XBTUSD contract price and the referenced exchange rate.  The funding rate is exchanged directly peer-to-peer among contract holders.

51.     BitMEX's products are particularly sensitive to price manipulation because BitMEX allows traders to operate on substantial amounts of leverage.  BitMEX allows traders to leverage their position up to 100 times the amount of collateral, or "margin," they post.  Put differently, traders can buy or sell 100 bitcoin worth of XBTUSD contracts for only 1 bitcoin of collateral.  This leverage magnifies both gains and losses:  if the price of the XBTUSD goes up, a buyer who is 100X leveraged will experience 100 times the profit, but if the price declines even 1 percent, the buyer will have lost all his collateral.  In this way, BitMEX structures its products to offer the allure of large, lottery-ticket payoffs for limited money.

52.     BitMEX's fees, however, are calculated based on the leveraged position, not on the underlying collateral.  Thus, where BitMEX advertises a fee of 0.075 percent for the XBTUSD Perpetual Contract, that percentage refers to the amount of the unleveraged position.  For a 100X leveraged future, BitMEX is charging a fee of 7.5 percent.

53.     In a leveraged trade, BitMEX limits a trader's loss to solely the posted margin.  By contrast, major derivatives exchanges, such as the Chicago Mercantile Exchange, expose traders to unlimited risk.  When the unrealized loss of a position exceeds the posted margins, those exchanges will ask traders to post additional collateral to supplement their margin.  This is known as a margin call.  For example, if a trader had a $10,000 position supported by $1,000 of margin, and the value of the position fell 10 percent to $9,000, it would trigger a margin call.

54.     To limit traders' losses to the posted margin, BitMEX uses a liquidation engine to automatically close positions with unrealized losses equal to half of the amount of the posted collateral.  BitMEX describes this policy as designed to prevent losses greater than the collateral posted by the trader and to ensure that the winner receives their full profits.  While the promise that a trader can only lose the minimal margin put up for a highly leveraged bet may be alluring to retail investors, in reality BitMEX uses this promise to lure them into a false sense of security. BitMEX's system encourages traders to place highly leveraged bets under this pseudo-protection but takes their money in liquidations.  Put differently, when BitMEX liquidates a position, there is going to be a winning trader and a losing trader, but even beyond receiving the transaction fees, BitMEX almost always pockets a large part of one trader's collateral, allowing it to profit from the liquidation.

### B. BitMEX Profits From Its Rapacious Liquidation System

#### 1. BitMEX's Automatic Liquidation System And The So-Called "Insurance Fund"

55.     BitMEX's model of encouraging its users to experience volatility disproportionate to their collateral through substantial leveraging purports to rely upon a mechanism that prevents those users from experiencing losses greater than they can handle—there is, after all, someone on the other end of the transaction that expects to get paid.  BitMEX achieves this through the use of an automatic liquidation system.  The system is the brainchild of Defendant Delo, who designed and conceived it.  This system, however, does more than liquidate positions with insufficient collateral—it also creates substantial profits for BitMEX at the expense of its customers.

56.     Because BitMEX allows traders to take highly leveraged positions, there is a risk that a losing trader may not be able to pay the winner for his position.  In order to prevent winners from being adversely affected by the lack of a counterparty's collateral, BitMEX agrees to cover their winnings.  In exchange, it automatically takes the loser's collateral.  It then seeks to sell the position on the market at the best price available, with the purchaser stepping into the shoes of the liquidated party with responsibility for covering the counterparty's profits after sale.[1]  This process of taking the loser's collateral in exchange for covering the winner's profits until a counterparty is found is the automatic-liquidation system.

57.     BitMEX, however, does not wait to liquidate until the collateral can no longer cover the losses.  Instead, it liquidates when the collateral is still worth approximately twice the losses incurred, even though the trader has half of the initial collateral remaining.  Even if the system is

---

[1] If it is possible to make such a sale, the purchaser steps into the shoes of the liquidated party, such that the counterparty is in no way affected by (or even aware of) the liquidation of the other side.  The new purchaser can be leveraged and is in turn subject to potential liquidation as well. Only if no such trade is possible are both of the original positions liquidated.

able to find a price for the position after the liquidation that would have allowed the trader to recoup some losses, the trader receives nothing.  Instead, BitMEX pockets that recovery for itself and puts it into its "Insurance Fund."

58.     To use an example from BitMEX's own website,[2] consider a trader who has taken a long position on 100 ether using only 1 bitcoin as collateral while bitcoin and ether are each trading at $4,000.  This trader is 100X leveraged, such that a rise in the price of ether by $10 will cause the trader to gain $1,000.  Because of this level of leverage, the trader runs a substantial risk of not being able to pay off an unsuccessful contract; his collateral can absorb only a $40 decrease in the price of ether.  The price at which the trader's collateral can no longer cover the losses on the position is the "bankruptcy price."   In this example, the bankruptcy price is slightly over $3,960, as ether falling to that price would mean that the 1 bitcoin used as collateral would exactly cover the losses.  Rather than using this bankruptcy price as the liquidation point, BitMEX imposes a 0.5 percent "maintenance margin," such that the position will automatically be liquidated if the price of ether falls to $3,980.  This maintenance margin is remarkable relative to the amount of leverage in the position, as a change of one half of one percent in the price of bitcoin will result in an automatic liquidation.

59.     If the price hits $3,980 and this liquidation occurs, BitMEX will seize the collateral and then seek to sell the 100-ether position to another customer, while covering the gains and without terminating the contract of the original counterparty.  If this sale occurs at a price of $3,978, reflecting a $2 bid-ask spread, the purchase as a whole will have incurred a loss of $2,200

---

[2] This example has been modified from the one on the BitMEX website only in that the position in question is tied to ether rather than bitcoin—this change simplifies the mathematics by preventing price movements from affecting the value of the collateral but does not materially affect the outcome.

against the initial $4,000 wagered—a $22 loss multiplied by the 100x leverage.  BitMEX, which takes the full collateral, has accordingly profited $1,800 from the liquidation of its customers' position and places this profit in the Insurance Fund.  The trader, meanwhile, loses the full $4,000. This scenario is summarized in the chart below:

|  | Customer | Counterparty | BitMEX |
|---|---|---|---|
| ether price decreases $22 before a purchaser is found | $0 | $22x100=$2,200 | -$22x100 = -$2,200 |
| BitMEX seizes 1 bitcoin of collateral | -1 bitcoin (value: $4,000) | $0 | +1 bitcoin (value: $4,000) |
| Net gain/loss | -$4,000 | +$2,200 | +$1,800 |

60.     The profitability of the Insurance Fund is thus tied to the liquidity of the market—as BitMEX itself has stated, the Insurance Fund will profit from each liquidation as long as the bid-ask is smaller than the maintenance margin.

### 2.     BitMEX's Insurance Fund Is In Fact A Profit Center

61.     Despite being described as a mechanism intended "to help ensure winners receive their expected profits, while still limiting the downside liability for losing traders" by guaranteeing that BitMEX always has cash on hand to pay off losing trades, BitMEX's Insurance Fund shows consistent and substantial overall profit from these liquidations.  As their own data shows, the Insurance Fund has grown every year, as BitMEX takes in far more from liquidating its customers' positions than it pays out to cover contracts it cannot close quickly enough, providing a second source of profit beyond the commissions it charges.  In fact, the Insurance Fund grows in value nearly every day:  over the last 100 (volatile) days, it has begun only seven of them with a balance less than it began with the day before.  In fact, as of April 23, 2020 the Insurance Fund contained 35,494 bitcoin, representing approximately 0.19 percent of the total bitcoin in circulation.

Moreover, BitMEX partitions the fund by contract type, and, when no more contracts of a given type remain (because, for example, the contract was tied to a time period that expired), the portion of the Insurance Fund for that contract type is retained by BitMEX as profit.

62.     This relationship has been established through quantitative expert analysis. By comparing the number of recent liquidated positions to the growth of BitMEX's insurance fund, this analysis has concluded that, on average during the period between July 26, 2019 and March 24, 2020[3], the growth of the insurance fund increased by 0.12 bitcoin for every position that was liquidated in a given day, with BitMEX liquidating an average of 286 positions a day—equating to a daily increase in the Insurance Fund of over $250,000 at bitcoin's current price.

### 3.     BitMEX Liquidates More Positions And Grows Its Insurance Fund More Quickly When There Is More Volatility

63.     Because BitMEX liquidates positions when they are sufficiently out of the money, even if only for a very short period, it profits from high volatility. In a highly volatile market, more traders will hit their liquidation points and be liquidated. If a market vacillates sufficiently, both long and short traders may be liquidated in a day that saw relatively little ultimate movement (*i.e.*, a day with significant intra-day price movement). Because of the high leverage used by BitMEX traders, even transitory swings of one percent in each direction can cause liquidations.

64.     The relationship between volatility and liquidations has become evident through an expert statistical analysis of liquidations and the volatility of the popular XBTUSD Perpetual Contract. As the below graphic makes clear (which is based on publicly available data), liquidations follow volatility almost in lockstep; this result is significant to a 95 percent confidence level.

---

[3] Liquidation data from before July 26, 2019 is not publicly available.



65.   The correlation between volatility and liquidation volume is also illustrated in the below graphic.  This image displays the volatility of bitcoin price on the x-axis and the number of positions liquidated on the y-axis.  The tight fit of the line to the data and the positive slope show a high correlation coefficient of 0.84 from July 2019 to March 2020, based on available data,

between bitcoin volatility and liquidations.  The result is statistically significant to a 95 percent confidence level:



66.    Because liquidations are more common during periods of high volatility and because BitMEX profits from the majority of its liquidations, we would expect to see the Insurance Fund grow as volatility increases.  Sure enough, expert analysis has revealed that this relationship holds.  During periods of high volatility, the insurance fund grew more than 50 percent faster than it did generally, and more than twice as fast than it grew in periods of low volatility.  A true "insurance fund," by contrast, if it were serving a legitimate insurance function, would generally decline in periods of higher volatility, not increase.  The fact that the BitMEX Insurance Fund systematically and predictably *increases* in periods of higher volatility supports that it is a fraudulent device designed to enrich the owners of BitMEX at the expense of its customers.

### 4.    The Growth Of The Insurance Fund Is Not Proportionate To BitMEX's Needs

67.    The growth of the Insurance Fund cannot be justified by increased need for insurance based on increased trading volume.  As an expert quantitative analysis has revealed, the Insurance Fund has grown much faster than the trading volume on BitMEX.  The below graphic indicates that while BitMEX's trading volume has increased, the Insurance Fund has grown far more rapidly.  The ratio between the Insurance Fund and the value of the positions increased sharply since 2017.  In 2017, every bitcoin in the Insurance Fund supported 155 bitcoin in volume.  By 2019, the bloated Insurance Fund had one bitcoin for every 12 bitcoin of trading volume.



68.    BitMEX has thus profited from the vast majority of the automatic liquidations it conducts on behalf of its customers.  The structure of BitMEX's automatic liquidations creates an

incentive for BitMEX to induce liquidations as long as there is sufficient liquidity in the market that the bid-ask spread is smaller than the maintenance margin.  As long as this liquidity is present, BitMEX profits when it causes its customers' positions to automatically liquidate.

### C. BitMEX Manipulates Its Severs And Prices In Order To Liquidate Its Customers And Profit

#### 1. Undisclosed "Deficiencies" In BitMEX's Servers Prevent Users From Accessing Their Accounts While BitMEX Liquidates Them For Profit

69.     Defendants did not merely benefit from a punitive liquidation system that allows them to profit when the market is volatile.  Instead, Defendants claimed that technical issues in BitMEX's server, not found in other exchanges, locked out users at crucial times and enabled BitMEX to profit through its Insurance Fund.

70.     BitMEX's risk-management process, which performs the system's automatic liquidations, must check the entire system whenever the price of a future changes.  This process, although sometimes completed quickly, supposedly causes BitMEX's servers to freeze on average between two and three times a day.  During these server freezes, customers are locked out of their accounts and lose the ability to trade until the servers unfreeze.

71.     When BitMEX's servers are frozen, preventing customers from executing any trades, the prices of the futures contracts are *not* frozen — trades and liquidations occur even while customers are locked out of their accounts.  BitMEX continues processing certain previously placed transactions while refusing to accept transactions from others.  This means that a Class member can be prevented from executing a trade by a server freeze only to find, once the server reopens, that the price at which they sought to transact is no longer available.  Class members can also find that an offer they had made before the freeze but sought to retract during it has since been accepted.

72.     BitMEX's server freezes also enable automatic liquidations, which are profitable to BitMEX, because these liquidations continue to occur during the freeze.  A customer who has a 100X leveraged position on 1 bitcoin that will liquidate if the price of bitcoin falls from $4,000 to $3,980, for example, would be expected to sell when the price hits $3,985, accepting a loss of $1,500 but retaining the remaining capital of $2,500.  If the frozen servers prevent this sale from transpiring, however, the customer will lose all of her capital when the price hits $3,980.  Such a scenario profits BitMEX, which pockets the capital.

73.     BitMEX could remove the potential for these manipulative actions and prevent users from suffering from periods of denied access to a moving market by prohibiting its system from processing any transactions during these freezes.  Instead, BitMEX profits from the liquidations that predictably occur while its customers are unable to escape unfavorable positions.

### 2.     BitMEX Freezes Its Servers As A Tool To Maximize BitMEX's Profit At The Expense Of Its Customers

74.     The timing of server freezes on BitMEX, moreover, is not random.  The most important and profitable time for BitMEX to freeze, as shown, is during a period of high volatility. Because volatility allows it to profit from liquidations, BitMEX is incentivized to freeze its servers during periods of high volatility, allowing BitMEX to liquidate positions while customers are locked out.  The evidence compels the conclusion that BitMEX has consistently acted on those incentives.

75.     In particular, expert statistical analysis conducted of the freeze periods reported on BitMEX's website has revealed that the probability of outages is *100 percent* higher when volatility of Bitcoin prices is higher than the average.  When Bitcoin prices are in the top percentile of their volatility, the probability of an outage is increased over *2,000 percent*.  These results are statistically significant at a 95 percent confidence level.

76.     The relationship between periods when BitMEX freezes its servers and when high volatility enables mass liquidations is shown by the below chart prepared through expert analysis. The red lines indicate periods when servers were frozen, while the height of the blue bars indicate the volatility of bitcoin during each period.  As the chart displays, the freezes (indicated by the red stripes) most often occurred during the highest periods of volatility when BitMEX could effectively liquidate positions:



77.     That the timing of its server freezes maximizes BitMEX profits is reflected in a quantitative analysis of the relationship between server freezes and the growth of the Insurance Fund.  That expert analysis revealed that, over a two-year period, the Insurance Fund grew *over four times as fast* on days with a server outage than in the surrounding days without a server outage.

### 3.     BitMEX Freezes Its Servers To Protect Itself From Losses

78.     BitMEX also freezes its servers to protect itself from losses at the expense of its customers.  This sort of defensive freeze was demonstrated on March 12, 2020.  On that day, the

price of bitcoin fell from $7,200 to a 10-month low of $5,678 in just 15 minutes, and continued to fall from there, ultimately dropping below $4,000.   As the price plummeted, BitMEX automatically liquidated over *$700* million of its customers' positions.

79.     While liquidations are generally profitable for BitMEX, rapid and sustained movement in one direction threatens major losses for the Insurance Fund.  If the price of Bitcoin were to continue to fall, bid-ask spread would become so great that BitMEX could not sell the liquidated positions above their bankruptcy price, causing losses that are designed to be covered by the Insurance Fund.  This sort of event is exactly why BitMEX claims to maintain the Insurance Fund—BitMEX is supposed to draw from the fund to cover its losses under these circumstances.

80.     As prices fell, however, BitMEX did not immediately sell the positions it obtained through liquidation orders at a loss to its Insurance Fund.  Instead, it kept its newly acquired positions open, allowing it to profit from liquidations if prices rose, while also creating a new risk that further declines would exacerbate the losses.  This decision created economic liability for BitMEX unless the fall in bitcoin prices stopped and began to recover.  This is when BitMEX's servers froze.

81.     When the servers were restored, Bitcoin's price had stabilized, preventing the need for BitMEX to meaningfully deplete its Insurance Fund.  Over the next day, BitMEX gradually resold the positions it had acquired through liquidation and the Insurance Fund had hit a new high. But this recovery was not passed along to the traders who had hit their margins during the crash, including those who were unable to exit their positions because of BitMEX's supposedly frozen servers; they received nothing to compensate for their $700 million in liquidated assets.  In short, a perfectly timed server outage substantially mitigated a potential major loss for BitMEX's Insurance Fund and helped it hit a new high the next day, while disadvantaging its own customers.

82.     BitMEX first blamed the server shutdown on "a hardware issue with our cloud service provider," before Defendant Reed later claimed, without any support, that the server failure was the result of an attack by a "botnet."  Mr. Reed promised to provide further explanation "in the coming days" but has yet to disclose any additional information over a month later.

83.     This server freeze, like the others designed and intended to profit BitMEX by allowing it to liquidate customers locked in unfavorable positions, was not random or a technical glitch.  It was a deliberate decision designed to protect BitMEX's Insurance Fund at the expense of its customers.

### 4.     Technical Limitations Cannot Justify BitMEX's Server Freezes

84.     BitMEX's server issues cannot reasonably be explained by technical limitations. Similar server issues are not present in other exchanges that regularly handle far more transactions per second.

85.     While BitMEX has not made all of the data about its server capacity public, it has indicated that, as of May 2019, it was processing around 200 million trades per week, purportedly taxing its system and leading to server shutdowns.  This equates to an average load of around 330 trades a second.  BitMEX has indicated that its peak transactions can reach 30 times the average, for a peak of just under 10,000 trades a second.  ByBit, which also transacts primarily in futures and derivatives, can process 100,000 transactions a second.  Binance, another large exchange, can process 1.4 million transactions a second, more than 100 times the peaks that purportedly cause BitMEX's servers to freeze.  These exchanges have not experienced the pattern of repeated and sustained freezes that have become commonplace on BitMEX, and BitMEX has provided no explanation for why its servers are supposedly so inadequate.

86.     Even considered in isolation, the server freezes on BitMEX are demonstrably not caused by server load, as shown by a statistical analysis of transaction volume.  For example, on

May 12, 2019, BitMEX announced a new record of over $10 billion in transaction volume, with no server incidents reported that day.

87.     Expert analysis shows that the average number of trades during server freezes falls below the top 20 percentile of total trading volume.  Additionally, fewer than 20 percent of the server outages reported by BitMEX occurred during periods where BitMEX trading volume was in the top 5 percentile.  As illustrated by the graphic below based on analysis of freezes from March 1, 2018 to March 28, 2020, most of BitMEX's freezes do not come at periods of high transaction volume:



88.     BitMEX's servers are thus not freezing because of high volume, which would be the case if the freezes were a consequence of deficient servers.  Instead, they are freezing at moments of high volatility precisely because those are the most profitable points in time to freeze for BitMEX.  While promoting its trading platform as best-in-class, BitMEX has recklessly or

intentionally failed to disclose the susceptibility of its platform to these freezes and their predictable, negative effects on customers—and beneficial effect for BitMEX.

89.     During much of the Class Period, in its terms of service, BitMEX warned only that a customer's own Internet service might experience a disruption.  Only in early 2019 did BitMEX finally disclose to customers, and only vaguely, that undefined system overloads might disrupt access to the trading platform.  But even this disclosure failed to disclose the frequency of system overloads, their relationship to volatility, or the likelihood that they would harm customers to BitMEX's benefit.

90.     By failing to disclose the risk of these freezes during high volatility, and the likelihood of their negative impact on customers, while simultaneously touting its ever-increasing volume and supposed technical sophistication, BitMEX deceived customers into trading by recklessly making misleading statements of material facts and omitting to state material facts necessary to make BitMEX's statements not misleading.

91.     Just as fundamental, with respect to its disclosures since early 2019, BitMEX has at least recklessly claimed that it "shall make reasonable efforts to ensure that the Services are available to you" and that it "will use commercially reasonable efforts to avoid downtime of the Services during anticipated peak hours."  As to any system overloads or freezes that BitMEX may not have initiated deliberately, BitMEX failed to use reasonable or commercially reasonable efforts to avoid them, and knowingly or recklessly claimed otherwise, further deceiving customers into trading on the platform.

92.     In all of these respects regarding its server freezes, and in light of BitMEX's access to the occurrences on its own servers, BitMEX has either deliberately or recklessly employed an artifice to defraud its customers.

### 5.      BitMEX Did Not Disclose That It Trades Against Its Customers

93.      On April 28, 2018, an independent researcher requested comment from BitMEX regarding "information on record about insider accounts (possibly friends / acquittances of Bitmex staff) having special advantages over other Bitmex users."  BitMEX responded the same day, denying that it gave "preferential treatment" to any "customers."  This proved false.

94.      On April 30, 2018, BitMEX updated its terms of service and for the first time revealed that "BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform."  BitMEX thus revealed that it had historically maintained a for-profit desk trading on its own platform, which was trading against its own customers.

95.      BitMEX also revealed that its trading desk had the monopoly on making a market in its bitcoin options product.  BitMEX hid the role of its trading desk by labeling the employee in charge of the desk as part of "Risk Management."

96.      As an inside entity trading against its own customers, the BitMEX trading desk enjoyed a number of advantages:

97.      *First*, an internal BitMEX desk could have a higher trade priority than other traders, allowing its trades to be processed first when total trades exceeded BitMEX's server capacity.

98.      *Second*, an internal BitMEX trading desk could view the leverage amounts for previously created positions and the prices at which its liquidation will be triggered.  This information would make it easy to profitably manipulate the market.  If, for example, the trading desk sees that a number of short bitcoin futures are near their liquidation point, it could enter a large buy order.  This order would cause the price of bitcoin on the BitMEX exchange to rise, triggering the liquidation of these futures.  The liquidation would create a buy order for the liquidated contract, further increasing the price.  Once this chain of liquidations had caused the

price to rise far beyond the price at which the internal desk made its initial purchase, it could sell bitcoin at this higher price to fulfill the forced buy orders. Because these trades are automatic, an inside desk could execute this trade very quickly and with a high confidence of success.

99.    Even without placing trades that cause cascading liquidations, however, the BitMEX desk helps create the liquidity that keeps the forced liquidations profitable, including those that occur during server freezes. As BitMEX has admitted, it profits from each liquidation as long as the bid-ask is smaller than the maintenance margin. By creating liquidity through market-making, and freed from the possibility of being liquidated itself, BitMEX's trading desk helps maintain an environment that keeps the liquidations profitable.

100.   The interaction between the Insurance Fund and the trading desk creates a pernicious result when the desk serves as the purchaser of a liquidated position. When a customer stakes $4,000 on a position only to have BitMEX liquidate it, sell it to its own desk at a price that recovers $3,500 of that $4,000, and then keep the $3,500, BitMEX has walked away with both the position and the remainder of the initial capital, leaving the customer with nothing.

101.   Nor is the trading desk the only inside entity trading on BitMEX. Defendant Hayes has admitted that he himself trades on the platform, against BitMEX's customers. The customers on the other side of Hayes's contracts have no way of knowing that they are trading against an insider with access to non-public information about their trades, including their liquidation limits. Hayes has even gloated about the possibility of such misconduct: "The digital token trading markets like traditional forex markets are not regulated, and will struggle to be. Therefore, if you can't stomach insider trading, then don't take on short-term positions."

6.   **Plaintiff Brett Messieh's Experience Illustrates The Class's Injury From BitMEX's Manipulative Practices**

102.   The intersection of BitMEX's casino-like structure, punitive liquidation system, and manipulative freezes to BitMEX's benefit are amply illustrated by the experience of Plaintiffs, including Plaintiff Brett Messieh.  Mr. Messieh was lured to BitMEX by the promise of rapid potential gains that were enabled by the highly leveraged structure.  He invested tens of thousands of dollars in derivatives products offered by BitMEX.

103.   On several occasions, however, Mr. Messieh fell victim to having his investments liquidated during a server freeze.  On each of these occasions, the servers froze during a period of high volatility, and, when it unfroze, Mr. Messieh's position had been liquidated due to intervening price movements, which Mr. Messieh was powerless to prevent because of the freeze.  If the servers had not frozen, Mr. Messieh could have sold off these positions to protect against the liquidation of his capital.  Even when Mr. Messieh attempted to protect against this possibility by creating stop loss orders that were intended to automatically sell his position when it reached a certain level, the position was nonetheless liquidated during a server outage and the stop loss was ignored while BitMEX rapidly liquidated his position.

104.   Mr. Messieh reached out to BitMEX support on this issue on July 16, 2018, in an email with the subject line "Server Crash During Run Up..."  That email read as follows:

> Hi,
>
> The Bitmex servers crash kept me from being able to close my position and caused liquidation while I was unable to access Bitmex at all... Will there be any remedy for this or a roll back of any kind? It's very frustrating to have this happen at such a pivotal moment and isn't fair to customers who trust Bitmex. Thanks for your time and please let me know if there's a way to solve this issue. I would've been able to market stop and save 0.4 XBT if Bitmex didn't crash.

Mr. Messieh's experience was typical of those who were unable to protect their positions from liquidation during one of BitMEX's many server freezes.

105.    BitMEX responded only with a form e-mail, refusing to provide any compensation or future protection to Mr. Messieh:

> Hi bmbrett,
>
> We are aware of the issue and working hard to resolve it.
>
> Our systems have been restored.
>
> Unfortunately we cannot offer any compensation or perform a rollback.
>
> Please see our terms: https://www.bitmex.com/app/terms#7-Service-Performance
>
> Ticket: https://bitmex.freshdesk.com/helpdesk/tickets/125642
>
> Kind Regards,
>
> Stefan
>
> BitMEX

106.    BitMEX thus refused either to compensate Messieh for his losses or to provide any assurance that future server freezes would not similarly prevent him or other members of the Class from experiencing further harm.  And BitMEX did so without acknowledging that such freezes had been and would continue to be deliberate, or else without using reasonable efforts to prevent them and without disclosing to customers that they would happen and consistently work to their detriment.

### D.  The Class Has Suffered Substantial Damages

107.    As a direct result of Defendants' misrepresentations, omissions, and manipulation of the market for their derivative products, including through the use of the server freezes and a

hidden internal trading desk to create profitable liquidations, Plaintiffs and members of the Class have suffered significant damages in an amount to be proven at trial.

108.    While the precise measurement of the harm caused to the Class by Defendants' actions is not calculable at this stage, a partial approximation can be found in the value of the Insurance Fund, which is filled with the profits of Defendants' liquidations.  As of April 23, 2020, the Insurance Fund contained 35,494.4929XBT, valued at over $250 million.

## V.    EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THEIR MISCONDUCT

109.    Prior to April 30, 2018, Defendants concealed the existence of a proprietary trading desk that transacted against the interests of their own customers.  Defendants also concealed the workings of its Insurance Fund and the incentives created by it prior to February 11, 2019, when it provided certain details as to the working of the fund in a blog post on BitMEX's website.  Even that information did not disclose that BitMEX used server freezes to increase the profitability of the Insurance Fund.  Thus, the statute of limitations relating to the claims for relief alleged herein was tolled, due to Defendants' affirmative acts of concealment and the inherently self-concealing nature of their conduct.

110.    Neither Plaintiffs nor members of the Class would reasonably have known of Defendants' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, at least prior to April 30, 2018, when BitMEX disclosed the existence of its previously concealed proprietary trading desk.  Plaintiffs and members of the Class also lacked any basis for identifying Defendants as perpetrators of market manipulation or for calculating damages before that date.

## VI. __CLASS ALLEGATIONS__

111.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 and seek certification of the following Class:  All persons who purchased any derivative products on BitMEX in domestic U.S. transactions, between March 10, 2017 and the present.  Accordingly, the Class Period is March 10, 2017 through the present.

112.    Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

113.    Plaintiffs reserve the right to amend the Class definition if investigation or discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

114.    The members of the Class are so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

115.    Members of the Class are readily ascertainable and identifiable.  Members of the Class may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or its agents.  They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

116.    Plaintiffs' claims are typical of the claims of the Class members, as all members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein.  Plaintiffs do not have any interest that is in conflict with the interests of the members of the Class.

117.    Plaintiffs and members of the Class sustained damages from Defendants' common course of unlawful conduct.

118.    Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

119.    Plaintiffs seek declaratory relief for themselves and the Class, asking the Court to declare their purchase agreements with BitMEX void, such that prosecuting separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for BitMEX; and BitMEX has acted on grounds that apply generally to the Class, so that the declaratory relief is appropriate respecting the Class as a whole.

120.    Common questions and answers of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including but not limited to the following:

- Whether BitMEX profited through its Insurance Fund at the expense of its customers;

- Whether BitMEX intentionally triggered liquidations of its customers;

- Whether BitMEX caused server freezes in order to enable its market manipulation and profit at its customers' expense;

- Whether BitMEX made material omissions regarding the frequency and effect of its server freezes;

- Whether BitMEX failed to disclose its secret proprietary trading desk to its customers; and

- Whether BitMEX's customers were harmed through the above conduct by BitMEX.

121.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

122.   There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION
### Market Manipulation
### Sections 6 and 22 of the Commodity Exchange Act ("CEA") and 17 C.F.R. § 180.1
### (All Defendants)

123.   Plaintiffs reallege the allegations above.

124.   The crypto-assets referenced by the derivatives sold by BitMEX within its platform are commodities within the definition of 7 U.S.C. § 1a(9).

125.   Sections 6(c)(1) and 22(a)(1) of the CEA, 7 U.S.C. §§ 9(1), 25(a)(1), make it unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC shall promulgate not later than one year after July 21, 2010, the date Dodd-Frank was enacted.

126.   The CFTC timely promulgated Rule 180.1, 17 C.F.R. § 180.1, which makes it

> unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,

(4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

127.    Defendants' triggering automatic liquidations of positions through the improper use of strategic and undisclosed deployment of server freezes, and the undisclosed existence of a proprietary trading desk that transacted against the interests of its own customers constitute market manipulation of BitMEX-traded futures and derivatives in violation of Sections 6(c)(1), and 22(a)(1) of the CEA, 7 U.S.C. §§ 9(1), 25(a)(1), and Rule 180.1, 17 C.F.R. § 180.1.

128.    If the server freezes were unplanned and undeliberate, BitMEX has violated Rule 180.1 by recklessly failing to disclose the susceptibility of its platform to these freezes and their predictable, negative effects on customers—and beneficial effect for BitMEX; by recklessly engaging in a course of business that operates as a fraud or deceit on Plaintiffs and the Class, including by failing to use commercially reasonable efforts to prevent such freezes and by recklessly claiming otherwise; and by thus recklessly, if not deliberately, employing an artifice to defraud Plaintiffs and the Class.

129.    Defendants' manipulation and misconduct deprived Plaintiffs and the Class of a lawfully operating market during the Class Period.

130.    Plaintiffs and others who transacted in BitMEX-traded crypto-derivatives during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-

conspirators' manipulations in violation of the CEA and Rule 180.1, were subject to liquidations because of these artificial prices, and as a direct result thereof were injured and suffered damages.

131.   Plaintiffs each sustained actual damages for these violations of the CEA.

**SECOND CAUSE OF ACTION**
**Principal Agent Liability**
**Section 2 of the Commodity Exchange Act**
**(All Defendants)**

132.    Plaintiffs reallege the allegations above.

133.   Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

134.   Plaintiffs each sustained actual damages for these violations of the CEA.

**THIRD CAUSE OF ACTION**
**Aiding and Abetting**
**Sections 13 and 22 Commodity Exchange Act**
**(Arthur Hayes, Ben Delo, and Samuel Reed)**

135.   Plaintiffs reallege the allegations above.

136.   Arthur Hayes, Ben Delo, and Samuel Reed ("the Individual Defendants") knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein.  The Individual Defendants did so knowing of each other's, and their co-conspirators', manipulation of the prices of digital assets and their BitMEX derivatives, and willfully intended to assist these manipulations, which resulted in pricing for these BitMEX derivatives becoming artificial during the Class Period in violation of Sections 13(a) and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a), 25(a)(1).

137.   Plaintiffs each sustained actual damages for these violations of the CEA.

## **PRAYER FOR RELIEF**

138.    On behalf of themselves and the Class, Plaintiffs request relief as follows:

(a)  That the Court determines that this action may be maintained as a class action, that Plaintiffs be named as Class Representatives of the Class, that the undersigned be named as Lead Class Counsel of the Class, and that notice of this action be given to Class members;

(b)  That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal laws set forth above;

(c)  That the Court award Plaintiffs and the Class damages in an amount to be determined at trial;

(d)  That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiffs and the Class are entitled, including a declaration that the purchase agreements between each member of the Class and BitMEX are void;

(e)  That the Court award Plaintiffs and the Class pre- and post-judgment interest;

(f)  That the Court award Plaintiffs and the Class their reasonable attorneys' fees and costs of suit; and

(g)  That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## **JURY TRIAL**

139.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury for all claims.

Dated:      April 23, 2020
            New York, New York

                                    Respectfully submitted,

/s/ Philippe Z. Selendy              /s/ Kyle W. Roche
Philippe Z. Selendy                  Kyle W. Roche
Jordan A. Goldstein                  Edward Normand
Joshua Margolin                      Velvel (Devin) Freedman (*pro hac pending*)
Mitchell Nobel                       Joseph M. Delich
SELENDY & GAY, PLLC                  Richard R. Cipolla (*admission pending*)
1290 Sixth Avenue, 17th Floor        ROCHE CYRULNIK
New York, NY 10104                       FREEDMAN LLP
pselendy@selendygay.com              99 Park Avenue, 19th Floor
jgoldstein@selendygay.com            New York, NY 10016
jmargolin@selendygay.com             kyle@rcfllp.com
mnobel@selendygay.com                tnormand@rcfllp.com
                                     vel@rcfllp.com
                                     jdelich@rcfllp.com
                                     rcipolla@rcfllp.com