**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DREW LEE and FELIX LUFKIN, individually and on behalf of all others similarly situated,<br>Plaintiffs,<br>v.<br>HDR GLOBAL TRADING LIMITED, ABS GLOBAL TRADING LIMITED, 100X HOLDINGS LIMITED, SHINE EFFORT INC LIMITED, HDR GLOBAL SERVICES (BERMUDA), ARTHUR HAYES, BEN DELO, GREG DWYER, and SAMUEL REED,<br>Defendants. | No. 1:20-cv-03232-ALC<br><br>**JURY DEMANDED** |

**THIRD AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Pages**


I. INTRODUCTION .....1

II. PARTIES .....7

A. Plaintiffs .....7

B. Defendants .....8

III. JURISDICTION AND VENUE .....14

IV. FACTUAL ALLEGATIONS .....17

A. Crypto-Assets And The Operation Of BitMEX .....17

1. An Introduction To Crypto-Assets .....17

2. The Origins Of BitMEX .....20

3. Operation Of BitMEX And Its Derivatives Products .....28

4. BitMEX's Automatic Liquidation System And The So-Called "Insurance Fund" .....33

a. BitMEX Profits From Its Liquidations .....36

b. BitMEX Liquidates More Positions And Grows Its Insurance Fund More Quickly When There Is More Volatility .....37

c. The Growth Of The Insurance Fund Is Driven By BitMEX's Profiting Off Of The Vast Majority Of Liquidations, Rather Than A Legitimate Goal To Insure Against Loss .....40

5. BitMEX's Servers Routinely "Lock Out" Customers, Preventing Them From Trading On Their Accounts While Bitmex Liquidates Their Positions .....41

B. BitMEX's Undisclosed Insider Trading Desk Uses Hidden Information to Trade Against BitMEX Customers and Manipulate its Prices in Order to Profit BitMEX .....45

1. BitMEX Manipulates Its Prices and Secretly Trades Against Its Customers Using Accounts That Have Access To Hidden Information And Are Immune from Lockout .....45

2. BitMEX Manipulates Its Prices To Ensure Its Profit And Its Customers' Loss....49

C. BitMEX Profits by Freezing its Servers and Trading Against Its Customers In Order To Liquidate Their Positions....58

1. BitMEX Freezes Its Servers As A Tool To Maximize BitMEX's Profit At The Expense Of Its Customers....58

2. BitMEX Freezes Its Servers To Protect Itself From Losses....60

3. The Experiences of Class Members Illustrate The Harm Resulting From BitMEX's Manipulative Practices....61

D. BitMEX Is A Domestic Exchange....63

E. The Class Has Suffered Substantial Damages....69

V. DEFENDANTS' CONCEALMENT OF THEIR MISCONDUCT PREVENTED PLAINTIFFS AND MEMBERS OF THE CLASS FROM BRINGING A CLAIM AT THE TIME THE EVENTS OCURRED....69

VI. CLASS ALLEGATIONS....70

FIRST CAUSE OF ACTION....73

SECOND CAUSE OF ACTION....83

THIRD CAUSE OF ACTION....88

FOURTH CAUSE OF ACTION....91

FIFTH CAUSE OF ACTION....95

PRAYER FOR RELIEF....96

JURY TRIAL....97

Individually and on behalf of all others similarly situated, Plaintiffs Drew Lee and Felix Lufkin bring this action against Defendants HDR Global Trading Limited, ABS Global Trading Limited, 100x Holdings Limited, Shine Effort Inc Limited, HDR Global Services (Bermuda) Limited (collectively, "BitMEX"), Arthur Hayes, Ben Delo, Samuel Reed, and Greg Dwyer. Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, expert analysis of publicly disclosed reports and information about Defendants and conversations with former BitMEX employees. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and can be discovered after a reasonable opportunity for discovery. Plaintiffs hereby allege as follows:

## I. INTRODUCTION

1. On behalf of a class of investors (the "Class") who purchased Bitcoin and Ethereum derivative products that BitMEX has sold through its domestic exchange since February 28, 2016 (the "Class Period"), Plaintiffs and members of the Class seek to recover the damages suffered from Defendants' unlawful actions, the consideration they paid for the products, and the fees they paid to BitMEX in connection with their purchases.

2. BitMEX is one of the world's largest crypto-asset exchanges and has earned over $1 billion in fees from transactions on its platform since November 2014. As of September 2020, BitMEX advertised that it had a transaction volume of $74.06 billion in the preceding 30 days and $956.83 billion in the prior year. BitMEX describes itself to customers as "Bitcoin's most advanced trading platform." In truth, the exchange was rigged, and behind the scenes BitMEX has manipulated both its systems and the market so that BitMEX can turn outsized profits at the expense of its customers. BitMEX's disregard for the laws and regulations of the United States

while targeting U.S. investors led the Commodity Futures Trading Commission ("CFTC") to bring an enforcement action against it and its directors, and resulted in guilty pleas by BitMEX's executives—the individual defendants in this action—for their roles in illegally targeting U.S. investors.

3. At the heart of BitMEX's scheme was its Insider Trading Desk, whose existence BitMEX did not disclose until April 2018 and whose scope BitMEX never disclosed—but has been revealed to Plaintiffs by former BitMEX employees. The Insider Trading Desk was staffed by at least three BitMEX employees who had "God Access" to customer accounts, allowing them to see information that BitMEX misled its customers into believing was private. These BitMEX insiders used software that allowed them to determine which market movements would liquidate the highest number of customers and would then make strategic trades designed to induce those price movements. These manipulations of the price of BitMEX's derivatives occurred both on the BitMEX exchange and on other "reference" exchanges that helped set prices at BitMEX.

4. BitMEX concealed its Insider Trading Desk from its own customers for as long as it could. BitMEX revealed the existence of this trading desk on April 30, 2018, under pressure from an independent analyst armed with trade data reflecting its existence. This revelation directly led to the resignation of BitMEX's General Counsel the next day and of its outside counsel, Sullivan & Cromwell, within a month. But even after this trading desk was revealed and BitMEX claimed that it would serve only a neutral market-making role, BitMEX continued to trade secretly against its customers. BitMEX created "burner" trading accounts, linked to anonymous email addresses created for just this purpose, which it then used to trade against its own customers without ever disclosing it was doing so.

5. The Insider Trading Desk was created shortly after BitMEX pivoted from serving institutional investors to serving retail investors. As BitMEX's co-founder and CEO Defendant Arthur Hayes described it, BitMEX was conceived to serve Wall Street institutional investors "who were going to want the same type of products" they were used to trading at sophisticated multinational banks. Yet for the first six months after BitMEX went live in late 2014, "no one came" to the trading platform. So, in Hayes's words, BitMEX changed its business model to "focus[] on degenerate gamblers; a.k.a. retail traders," luring the "degenerate[s]" in by offering eye-popping "100X leverage" trades. But BitMEX never disclosed that the deck at its virtual casino was stacked in the house's favor.

6. By allowing customers to leverage at the extraordinary ratio of 100:1—about twenty times higher than the common ratio in trading—BitMEX positions itself to benefit repeatedly, significantly, and predictably from its manipulation of the platform. This high leverage rate is so profitable for BitMEX because the exchange automatically liquidates contracts when their values fall at or below a certain level specified by BitMEX. When it liquidates a contract, BitMEX seizes all of the investor's remaining collateral for that contract. By setting the liquidation point higher than necessary to protect against the risk of a loss on that contract greater than the investor's collateral, BitMEX routinely profits from these liquidations.

7. BitMEX places these profits in its so-called "Insurance Fund," which it markets as a way to ensure that BitMEX has cash on hand for the occasions where an investor's losses exceed his collateral. In reality, however, the Insurance Fund is a slush fund for BitMEX, comprising funds that BitMEX is not obligated to maintain or use for any particular purpose—and that BitMEX can draw on whenever it chooses. In fact, the Insurance Fund has grown rapidly during periods of high volatility, as more customers' positions are liquidated, and is now well out of

proportion with the possible losses against which it is purportedly intended to insure. In this way, the combination of a customer base that frequently enters into extremely high-leverage trades and a series of automated policies that quickly and consistently liquidates these leveraged trades has yielded BitMEX a steady stream of profit. Indeed, Defendant Hayes has publicly described BitMEX as the "lord of liquidation" which will "feast on the souls" of those who trade on the platform.

8. In addition to being subject to this punishing liquidation policy, customers on BitMEX are repeatedly blocked from trading in their accounts—which BitMEX blames on technical glitches and limitations even though its competitors do not experience similar lock-outs and these lock-outs cannot be justified by trading volume. During these lock-outs, customers are unable to access their accounts or change their positions, but the market continues to operate and BitMEX continues to liquidate positions based on the moving market.

9. This combination of a punitive liquidation system and inaccessible accounts allowed the Insider Trading Desk to extract extraordinary and unlawful monetary gains from the Class. The secret trading accounts that the Insider Trading Desk created to profit from its customers benefited from two crucial advantages.

10. *First*, the operators of these undisclosed internal trading accounts could use their "God Access" to see all of BitMEX's customers' private information and could use that information to profit at its customers' expense. BitMEX promised its customers that certain of their trading information would not be visible to other traders. For example, BitMEX does not publicly display the liquidation points of each customer's position, meaning that traders do not know when others in the market will have their positions closed out. BitMEX also allows its customers to place "hidden" orders that are concealed from other market participants until

triggered. By viewing hidden orders that customers place with the understanding that those orders will be hidden from other market participants, BitMEX traders gain information that they can use to make profitable trades. And by accessing the hidden liquidation prices, these internal traders can assess what trades they need to enter to force liquidations of customer accounts and thereby profit BitMEX.

11. *Second*, BitMEX's internal trading accounts created by the operators of the Insider Trading Desk essentially function as super accounts, immune from the lock-outs that plague its customers' accounts. In contrast to its customers, who are subject to, and disadvantaged by, lock-outs, the Insider Trading Desk is not subject to lock-outs—thus ceding to BitMEX an enormous trading advantage as compared to its customers, against whom BitMEX routinely trades. BitMEX thus prevents its customers from escaping positions until they fall to a level at which BitMEX can liquidate those positions at a further profit to itself, while at the same time trading against its customers through a proprietary desk that is not subject to the lock-outs that hinder its customers. Through its trades, BitMEX's Insider Trading Desk allows BitMEX to manipulate the prices of the derivatives they offered to the Class in order to profit themselves.

12. BitMEX further manipulates the prices of its derivatives by manipulating prices of the referenced assets on other exchanges. BitMEX relies on a small number of lightly traded "reference exchanges" to link prices of BitMEX derivatives to the prices of the crypto-commodities they reference. Using strategically timed trades that were targeted to moments when these exchanges were particularly vulnerable to manipulation, Defendants caused prices on these exchanges to fluctuate artificially. These fluctuations were then reflected on BitMEX, leading to liquidations that were profitable to BitMEX and harmful to its customers.

13. BitMEX also harms its customers by strategically freezing its servers. BitMEX can use this capacity offensively, allowing its servers to freeze at moments of high volatility so as to maximize the number of customers who can be liquidated. But it can do so defensively as well. BitMEX's operations on March 12, 2020 are a recent and striking example of a defensive freeze. As bitcoin's price plummeted from approximately $7,200 to under $4,000, resulting in a substantial sell-off, BitMEX's trading platform went offline for twenty-five minutes. As a result of the outage, BitMEX liquidated *$700 million* of its customers' highly leveraged positions for its own profit. As prices gradually recovered over the course of the day, BitMEX brought the exchange back online and sold off the positions it had liquidated during the crash, preventing any serious loss to the Insurance Fund. This "server outage" effectively protected BitMEX and the Insurance Fund from the cascading effects of sell-offs of BitMEX's highly leveraged and volatile products, while also stunting its customers' ability to protect themselves from having their BitMEX positions liquidated. In fact, the Insurance Fund hit an all-time high the very next day.

14. Throughout the Class Period, Defendant Greg Dwyer, BitMEX's first employee, managed the Insider Trading Desk while regularly working from BitMEX's office located in Manhattan, New York, New York. In his role as Head of Business Development, Dwyer had direct insight into BitMEX's continued offerings to U.S. customers; indeed, he tracked it. While managing the Insider Trading Desk, Dwyer tracked and circulated data on U.S. users actively trading on BitMEX. For example, in July 2017, Dwyer circulated a report to BitMEX founders Hayes, Delo, and Reed, stating, "United States remains the most popular country by visits and average number of active users per day."

15. BitMEX and those who have controlled its operations have thus engaged in deceptive misconduct and manipulated and exploited their liquidation and trading systems,

harming Plaintiffs and members of the Class who traded on BitMEX and were damaged thereby, had their positions artificially liquidated, or were otherwise disadvantaged through trades orchestrated by BitMEX's Insider Trading Desk and undisclosed private accounts, in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq*.

## II. PARTIES

### A. Plaintiffs

16. Plaintiff Drew Lee is a resident of New York, New York. During the Class Period, he purchased Bitcoin and Ethereum derivative products, the prices of which had been artificially manipulated by Defendants, and as a result suffered actual damages. For example, Drew Lee suffered at least the following actual damages through liquidations on BitMEX, which sum to a loss of 0.894 bitcoin (or "BTC")[1]:

a. On January 26, 2018, he was liquidated by BitMEX for his short position in XBTUSD[2] and lost 0.0000289 BTC as a result.

b. On January 26, 2018, he was liquidated by BitMEX for his short position in XBTUSD and lost 0.0000265 BTC as a result.

c. On January 29, 2018, he was liquidated by BitMEX for his long position in XBTUSD and lost 0.355 BTC as a result.

d. On January 30, 2018, he was liquidated by BitMEX for his long position in XBTUSD and lost 0.293 BTC as a result.

---

[1] As of 10:00 AM EDT on the day of the filing of this Second Amended Complaint, one bitcoin is valued at $28,144.19.

[2] XBTUSD is a Bitcoin derivative product created and offered by BitMEX that BitMEX describes as a "leveraged swap product."

e. On February 1, 2018, he was liquidated by BitMEX for his long position in XBTUSD and lost 0.238 BTC as a result.

f. On May 30, 2019 he was liquidated by BitMEX for his long position in ETHUSD[3] and lost 0.00775 BTC as a result.

17. Plaintiff Felix Lufkin is a resident of Montgomery, Massachusetts. During the Class Period and while located in the United States, he purchased Bitcoin and Ethereum derivative products, the prices of which had been artificially manipulated by Defendants, and as a result suffered actual damages. For example, Felix Lufkin suffered at least the following actual damages through liquidations on BitMEX, which sum to a loss of 0.2546 bitcoin (or "BTC"):

a. On March 8, 2020, he was liquidated by BitMEX for his long position in XBTUSD and lost 0.0011 BTC as a result.

b. On May 10, 2020, he was liquidated by BitMEX for his long position in XBTUSD and lost 0.2531 BTC as a result.

c. On August 3, 2020, he was liquidated by BitMEX for his long position in ETHUSD and lost 0.0004 BTC as a result.

**B. Defendants**

18. Defendant HDR Global Trading Limited ("HDR") launched in 2014; its name is an acronym of the last names of Defendants Hayes, Delo, and Reed. HDR is the owner of the trading platform called BitMEX and operated BitMEX out of an office in Manhattan. By January 2017, it had become, and remains, the largest crypto-asset derivatives exchange in the world, with the highest trading volume of any such derivatives exchange. HDR is incorporated in the Seychelles,

---

[3] ETHUSD is an Ethereum derivative product created and offered by BitMEX that BitMEX describes as a "swap."

with its principal office located at Global Gateway 8, Rue de la Perle, Providence Mahé, Seychelles. Defendant Hayes has stated that HDR was incorporated in the Seychelles because it would cost less to bribe Seychellois authorities—just "a coconut"—than it would cost to bribe regulators in the United States and elsewhere. In July 2020, HDR Global Trading Limited was restructured to be a subsidiary of the newly formed "100x Group."

19. Defendant ABS Global Trading Limited ("ABS") is a Delaware corporation created in 2017 and wholly owned by HDR; its name derives from the first names of its founders, Defendants Arthur Hayes, Ben Delo, and Sam Reed. It is registered to do business in New York. According to public records, it is headquartered at 31 Conduit Road, Flat 17B, The Morgan, Hong Kong. ABS is responsible for technical aspects of the BitMEX platform, including security services and implementing the user interface traders use to buy and sell products.

20. Defendant 100x Holdings Limited ("100x") is a holding company incorporated by Hayes, Delo, and Reed in Bermuda. Hayes "introduc[ed]" 100x on the BitMEX website in July 2020, announcing that "100x will become the new holding structure for HDR Global Trading and all our other assets, including the BitMEX platform."

21. Defendant Shine Effort Inc Limited ("Shine"), a Hong Kong corporation incorporated in 2014, is a subsidiary of HDR and 100x. Shine is the entity through which BitMEX conducts trading, both on its own BitMEX platform and with market participants on other exchanges. Shine is controlled by Hayes, Delo, and Reed.

22. Defendant HDR Global Services (Bermuda) Limited ("HDR Services") is a Bermudian company incorporated in 2018. It employs personnel performing duties for BitMEX.

23. Defendants ABS, HDR, 100x, Shine, and HDR Services share common ownership and directors, and refer to themselves collectively as "BitMEX." They make job postings that do

not differentiate between the companies, and employees identify themselves as working for "BitMEX." Each of these entities engages in sufficient marketing and technical work that necessarily touches upon every facet of BitMEX's operations, and critically, its manipulation.

24. Defendant Arthur Hayes is the founder and former CEO of both HDR and ABS. Hayes is a U.S. citizen who grew up in New York and went to graduate school at the Wharton School of the University of Pennsylvania. Although he resides in Hong Kong, he frequently traveled to New York to manage BitMEX's local office, to obtain investments and promote BitMEX, and to lure investors to the BitMEX platform, including by speaking at conferences in New York City, such as the 2017 and 2018 Consensus Invest conferences, and appearing on television programs for media outlets, including CNBC. On February 24, 2022, Hayes pleaded guilty in the Southern District of New York to violating the Bank Secrecy Act by willfully failing to establish, implement, and maintain an anti-money laundering program at BitMEX. In his guilty plea, Hayes admitted that there were BitMEX customers trading in Manhattan. In addition, the government's presentencing letter, which Hayes did not dispute, stated, among other things, that (i) "Hayes knew U.S. customers continued to access BitMEX through several means."; (ii) "BitMEX already had a significant number of U.S. users in September 2015 and made no effort to remove them."; (iii) "[Hayes] and his co-defendants did not actually bar U.S. IP addresses from the platform. Instead BitMEX only ran a single IP address check when new users created accounts, even though Hayes knew that users could easily avoid the initial check, including by using virtual private network services ('VPN') and then make subsequent logins from U.S. IP addresses."; (iv) "Hayes intentionally marketed to U.S. customers, including through his appearances on U.S. media outlets and through the BitMEX affiliate user program."; (v) "[Hayes] allowed some prominent users who he personally knew were U.S. persons to access and trade on

BitMEX's platform openly."; (vi) "[U]sers whose accounts were closed because they had been flagged as from the United States could still open a new account, even if they used the exact same email address as the closed account."; and (vii) "[A]s late as July 2017, nearly two years after claiming to have banned U.S. users, Hayes received a report from [Defendant] Greg Dwyer, a BitMEX employee, that showed that the 'United States remains the most popular country by visits and average number of active users per day.'" Prior to his removal as CEO, Hayes had always exercised the ultimate executive authority for BitMEX.

25. Defendant Samuel Reed was the Chief Technical Officer ("CTO") of both HDR and ABS and co-founded them along with Hayes and Delo. He is a U.S. citizen, and resides in the United States. As the chief "front-end" designer of BitMEX's platform, responsible for its appearance, upon information and belief Defendant Reed directed key operations of ABS. On March 9, 2022, Reed pleaded guilty in the Southern District of New York to violating the Bank Secrecy Act by willfully failing to establish, implement, and maintain an anti-money laundering program at BitMEX. In his guilty plea, Reed admitted that he knew about the presence of U.S. users and himself operated BitMEX out of the United States, specifically working with U.S.-based traders. Specifically, Reed stated, "In September 2015, BitMEX announced a policy barring U.S. users. Despite this policy, I understood that some U.S. users still accessed the platform." Further, the government stated at the allocution, which Reed did not dispute, "Mr. Reed knew that BitMEX was serving thousands of U.S. customers and knew that BitMEX's purported controls were ineffective at preventing U.S. users from accessing and trading on BitMEX. Mr. Reed also knew that BitMEX had extensive U.S. operations, including an office in Manhattan." The government's presentencing letter, which Reed did not dispute, stated: (i) "Reed played an important role at BitMEX, as Chief Technology Officer focused on the Company's technological decisions. As a

founder of the Company and a C-suite executive, Reed had supervisory authority within BitMEX, and he made technological choices about how to design various specifications that he knew meant that U.S. customers would continue to trade on the platform."; (ii) "Reed, and later Greg Dwyer, were physically based in the United States while carrying out their duties, and BitMEX had numerous other employees physically present in the U.S., including from an office in Manhattan."; (iii) "[A]s late as July 2017, nearly two years after claiming to have banned U.S. users, Reed received a report from Greg Dwyer that showed that the 'United States remains the most popular country by visits and average number of active users per day.' Subsequent monthly revenue reports continued to show the presence of U.S. users on BitMEX."; and (iv) "Reed allowed some users who he personally knew were U.S. persons to access and trade on BitMEX's platform openly."

26. Defendant Ben Delo co-founded both HDR and ABS with Hayes and Reed. As a mathematician, Defendant Delo was responsible for designing key trading systems implemented on the BitMEX platform. On February 24, 2022, Delo pleaded guilty in the Southern District of New York to violating the Bank Secrecy Act by willfully failing to establish, implement, and maintain an anti-money laundering program at BitMEX. In his guilty plea, Delo admitted: (i) "In the autumn of 2015, we announced a no-U.S. user policy. Despite our policy, I have understood that U.S. users still found their way on to BitMEX. I knew this because would regularly find U.S. users and kick them off. I understood that other U.[S.] users were still present."; (ii) "In June 2018, we began tracking and logging U.S. IP log-ins and did not immediately act to restrict trading for this set of known U.S. users."; and (iii) BitMEX "had an office in Manhattan" and had "customers in Manhattan."

27. Hayes, Reed, and Delo together controlled the operations of BitMEX. BitMEX employees who manage certain aspects of trading facility all ultimately act under the direction and

control of Hayes, Delo, and Reed. Key financial and trading decisions required "Founder" approval, meaning approval by Hayes, Delo, and Reed. Hayes, Delo and Reed continued to control BitMEX until October 8, 2020, when they were removed from their management responsibilities following their federal indictments.

28. Defendant Greg Dwyer was the head of business development at BitMEX. BitMEX hired Dwyer as its first non-founder employee in late 2015. During his employment at BitMEX, he served a variety of functions at BitMEX, including acting as the Head of Business Development, leading BitMEX's Customer Support team, managing sales staff, developing products for BitMEX, and leading the Insider Trading Desk. He frequently promoted BitMEX and its services, both on BitMEX's own website and on social media. These promotions involve appearing in videos hosted by United States media outlets like Business Insider. For the entirety of the Class Period, Dwyer worked in BitMEX's office in Manhattan, New York. As part of his job, Dwyer tracked data on thousands of U.S. customers on the BitMEX trading platform. On August 8, 2022, Dwyer pleaded guilty to violating the Bank Secrecy Act by failing to establish implement, and maintain an anti-money laundering program at BitMEX, and aiding and abetting the same. In his guilty plea, Dwyer admitted: (i) "In the fall of 2015, I began working for BitMEX, an online trading platform which offers derivatives based on cryptocurrencies, such as Bitcoin, and which accepted Bitcoin as margin for customer positions. I served as head of business development at the company, among other roles."; (ii) "When I joined BitMEX, I was residing in New York, and my work for the company, between when I started and the end of 2018, primarily took place in New York, including in Manhattan."; and (iii) "During my time working at BitMEX, I came to learn that even though BitMEX had a policy and certain controls in place to prohibit United States residents from trading on the platform, there were in fact United States residents trading on the

BitMEX platform. For example, as part of my customer support role, I worked with United States residents from the platform when I became aware of them."

## III. JURISDICTION AND VENUE

29. Jurisdiction of this Court is founded upon 28 U.S.C. § 1331 because this Amended Complaint asserts claims under the Commodity Exchange Act, 7 U.S.C. § 25(c).

30. This Court has personal jurisdiction over Defendants based upon their activities occurring in or aimed at the State of New York in connection with Defendants' manipulation of the Bitcoin and Ethereum derivatives sold on its exchange. As shown by the Defendants' guilty pleas and other court documents, for the entirety of the Class Period, BitMEX had extensive operations in the United States, including an office in Manhattan, New York on 42nd Street, where senior executives and other employees including Defendants Samuel Reed and Greg Dwyer were based. From Manhattan, Greg Dwyer tracked U.S. users actively trading on BitMEX while leading the operations of the Insider Trading Desk. Defendants in their plea allocutions admitted to their being U.S.-based users of BitMEX in Manhattan and in the Southern District of New York.

31. Venue is proper pursuant to 7 U.S.C. § 25(c) because this is a district wherein any defendant is found, resides, or transacts business, or wherein any act or transaction constituting the violation occurred. Throughout most, if not all, of the Class Period, BitMEX maintained an office in Midtown Manhattan and was recruiting individuals for this office on websites such as Linkedin.com, angel.co, and builtinnyc.com. BitMEX has employed approximately half of its workforce in the United States, including at least nine employees in New York and 56 in San Francisco. BitMEX also regularly solicited employees for positions in the New York City area, illustrating a clear intent to maintain a presence in, and operate from, New York in marketing itself to investors in the United States and this District, including members of the Class. Similarly, Defendant Dwyer, while working as the Head of Business Development, was based in New York

during the Class Period along with other BitMEX employees. Other BitMEX hires in New York include a Marketing Manager in April 2018 to promote BitMEX, an Investment Associate in May 2018, an Art Director in July 2018, and a Content Manager to write strategic marketing communications, press releases, pitches, emails, and web content in October 2018. On May 1, 2018, a BitMEX executive signed an agreement for office space in New York. In September 2019, BitMEX retained the New York office of a public relations firm to popularize its platform. In addition, BitMEX employees regularly speak and solicit business at large cryptography and blockchain conferences hosted in New York. For example, Defendant Hayes spoke at CoinDesk's annual Consensus: Invest conference in New York in 2017 and 2018 to discuss new products, and other business development employees solicited business during the 2016 CoinDesk event in New York.

32. BitMEX also maintains a highly interactive commercial website accessible and aimed at users in the United States. BitMEX's website allows users to register an account, deposit and withdraw bitcoin, trade derivative products based on crypto-assets, review research and investing advice posted by BitMEX employees, including Defendants Hayes and Dwyer, contact BitMEX customer support, and interact with other BitMEX users through a chat application overlaying the website and thus accessible on every screen. The website tracks the Internet Protocol ("IP") address of every user. BitMEX also uses several U.S.-based services to maintain the website and trading platform.

33. Although BitMEX claims not to allow users located within the United States to trade on its platform, trading from the United States is in fact both possible and common: as Defendant Hayes notes, as journalists and other commentators have explained, and as BitMEX's marketing of itself in the United States demonstrates, accessing BitMEX is trivially easy from the

United States using virtual private networks that purport to mask a trader's location. BitMEX knew of and promoted this behavior, keeping detailed records of its revenue that specifically broke out the portion attributable to United States trading as determined from location-sensitive IP addresses. In fact, between 20 and 30 percent of all BitMEX users were located in the United States.

34. There were reports circulated at BitMEX that identify the U.S. as the most popular country for BitMEX active traders. New York-based executive and operator of the Trading Desk, Dwyer, tracked the number of U.S. customers on the BitMEX trading platform and created a report, which he sent to Defendants. Dwyer as part of his customer support role worked with United States residents that were trading on the BitMEX platform while he tracked data on thousands of U.S. customers on the BitMEX trading platform. The report stated, "United States remains the most popular country by visits and average number of active users per day," and analyzed data on U.S. users of BitMEX. Thereafter, monthly revenue reports were continuously circulated throughout BitMEX tracking data on the thousands of U.S. users on BitMEX. Dwyer also tracked the millions of dollars in profit Defendants generated as a result of U.S.-based trading on BitMEX. Founders Hayes, Delo, and Reed received those reports, yet willfully facilitated thousands of U.S. customers actively trading on BitMEX's platform throughout the Class Period.

35. Defendant Hayes would appear on New York-based television programs in order to market to the United States, having recognized that these appearances led to a significant number of new accounts being opened from the United States. As one example of New York investors transacting with and on behalf of BitMEX, one popular New York-based trader earned referral fees for generating 900 customer sign-ups for BitMEX using his public Twitter account. Additionally, for much of the Class Period, BitMEX personnel conducted BitMEX operations from

an office in Manhattan, New York, including customer support, business development, and marketing to customers in the United States.

## IV. FACTUAL ALLEGATIONS

### A. Crypto-Assets And The Operation Of BitMEX

#### 1. An Introduction To Crypto-Assets

36. This case involves the sale of derivatives of crypto-assets, *i.e.*, digital assets designed to work as a medium of exchange, a store of value, or both. Unlike "real" or "fiat" currencies, crypto-assets do not have legal tender status in any jurisdiction, and do not derive their value from the imprimatur of any government entity. Instead, crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

37. Bitcoin was the world's first decentralized crypto-asset. It is also the largest and most popular crypto-asset, with a market capitalization of approximately $868 billion as of 10:00 AM EST on February 12, 2021. Bitcoin spawned a number of other crypto-assets that, together with bitcoin, had a market capitalization of $1.4 trillion as of 10:00 AM EST on February 12, 2021.[4] At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the blockchain.

38. Blockchains act as the central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the common goal of decentralization.

---

[4] The term "bitcoin" can refer to both a computer protocol and a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.

39. Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network. In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources, which has the effect of making the blockchain more accurate and secure. For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted bitcoin. This process is colloquially referred to as "mining."

40. Mining is one method by which an individual can acquire crypto-assets like bitcoin. A second and more common manner is to obtain crypto-assets from someone else. This is often accomplished by acquiring it through an online "crypto-asset exchange."

41. Online crypto-asset exchanges are one place to purchase bitcoin and other crypto-assets. These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies, who then transact through BitMEX.

42. Some traditional exchanges, including the Chicago Mercantile Exchange and the Chicago Board Options Exchange, have in recent years also begun offering exchanges of crypto-asset futures. Unlike BitMEX, both of these exchanges have been approved to do so by the CFTC.

43. For a time, bitcoin was the only crypto-asset available on exchanges. As crypto-assets grew in popularity, exchanges began listing other crypto-assets as well, and trading volumes expanded. In early 2013, daily bitcoin trading volumes hovered between $1 million and $25 million. By the end of 2017, daily bitcoin trading volumes ranged between $200 million and $3.8 billion.

44. In September 2015, the CFTC designated bitcoin a commodity. Some crypto-assets, including Ethereum[5], reproduce Bitcoin's defining central architecture—they provide a secure medium of exchange for general purposes, have a controlled supply that cannot be unilaterally increased, and are decentralized. These crypto-assets are also commodities and are thus called "crypto-commodities."

45. Demand for crypto-commodities is driven by the desire for a cryptographically secure and pseudonymous means of exchange in digital transactions for a wide variety of assets, independent of the control of any government, which can also be held by customers as a long-term, independent store of value. Demand is also driven by the speed with which crypto-commodities can be used to execute and settle transactions—especially those conducted on international digital platforms—and their ability to be used in "microtransactions" that may be too costly if performed with fiat currency or through other electronic means, such as credit cards.

46. By the end of 2016, interest in crypto-assets began to accelerate, with prices growing at a rate historically unprecedented for any asset class. Over the course of 2017 alone, bitcoin's price increased from approximately $1,000 to approximately $20,000. Ethereum's growth was even more startling. On January 1, 2017, Ethereum was trading at approximately $8 per ether. Approximately one year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

47. In April 2013, there were only seven crypto-assets listed on coinmarketcap.com, a popular website that tracks the crypto-asset markets. As of this filing, the site monitors more than 8,400 crypto-assets.

---

[5] Analogously with Bitcoin, accepted practice is to use the term "Ethereum" to label the protocol and software, and the term "ether" to label the units of exchange.

**2. The Origins Of BitMEX**

48. BitMEX does not sell bitcoin, ether, or any other crypto-commodity. Instead, BitMEX offers futures and swap products, which are tied to the future performance of these assets without requiring their direct ownership. To use the platform, traders must first deposit bitcoin they have obtained from another source. Then they can use that bitcoin as collateral to trade contracts that reference bitcoin or other crypto-assets.

49. BitMEX began offering derivative products for bitcoin in 2014 as one of the first players in the crypto-asset derivative space. Early on, struggling to make money, the founders chose to, as they put it, "focus[] on degenerate gamblers, a.k.a.; retail traders." Since then, its first-mover advantage has paid off: it is consistently among the largest crypto-asset derivatives traders by volume and has been for years. It now frequently trades over $3 billion worth of transactions in a single day.

50. BitMEX's founder and CEO, Defendant Hayes, is the P.T. Barnum of the crypto-asset world. Describing the trading of crypto-assets as "the entertainment business," he has embraced a role as impresario and promotor for the so-called "degenerate gamblers" he solicits, and encourages speculative trading by flaunting his lavish lifestyle and making bold predictions designed to elicit responses and move the market to create profit for BitMEX and himself. Hayes repeatedly flaunts his wealth to followers of the BitMEX platform, while also sharing his positions and profits he makes by betting on the price of bitcoin and other crypto-assets. The implication of these promotions is clear: you too could live like this, if you trade on my platform.













51. For example, when promoting BitMEX at Consensus 2018, a large conference in New York, Hayes announced his arrival in an exotic car:



52. Like many promoters, Hayes takes extreme positions and uses aggressive language to draw interest and attention to his product. For example, in July 2018, after the price of bitcoin crashed from $19,000 to below $6,000, Hayes predicted on national television that the price of bitcoin would reach $50,000 before the end of the year, encouraging traders to come to BitMEX. While the price of bitcoin rose in the days following his pronouncement to over $8,000, by January 1, 2019, it had fallen below $4,000.

53. Similarly, in advertising BitMEX, Hayes has denigrated the digital tokens BitMEX "proudly" lists derivatives of, suggesting they are "dogshit" and "a shitcoin," even as he directs customers to come and trade derivatives of these products on BitMEX:







54. BitMEX and Hayes also encouraged users to purchase by touting the appeal of high-leverage trading and engaging in holiday-related giveaways and promotions.






55. The BitMEX platform also has casino-like features built in. It promotes "winners" with a leaderboard of successful traders linked to BitMEX's homepage:




Top 25 Traders by Notional

| Rank | Name | Profit | Is Real Name |
|---|---|---|---|
| 1 | Quick-Grove-Mind | 8,047.8158 XBT | ✖ |
| 2 | Mercury-Wood-Sprite | 7,731.0973 XBT | ✖ |
| 3 | Heavy-Autumn-Wolf | 7,544.8921 XBT | ✖ |
| 4 | Alameda Research | 5,244.6841 XBT | ✔ |
| 5 | Hot-Relic-Fancier | 4,216.5159 XBT | ✖ |
| 6 | coincidentcapitalltd | 2,610.2783 XBT | ✔ |
| 7 | Jelly-Mint-Flier | 2,525.3227 XBT | ✖ |
| 8 | Skitter-Peridot-Raven | 2,343.9594 XBT | ✖ |
| 9 | Wheat-Storm-Speaker | 2,028.0849 XBT | ✖ |
| 10 | Honeysuckle-South-Rib | 2,011.3699 XBT | ✖ |

56. BitMEX runs promotions for its products to promote gambling, such as by providing prizes to "[t]he trader who continuously quotes the largest two-sided volume within a 0.5 percent spread" or "[t]he trader who has the largest profit (in XBT) from trading the NEO (NEOG18) contract."

57. These promotions attract numerous retail investors and distract them from the fact that BitMEX created an exchange that facilitates its own manipulative and fraudulent behavior. Hayes himself has obliquely acknowledged the existence of such misconduct, stating that "[t]he digital token trading markets like traditional forex markets are not regulated, and will struggle to be. Therefore, if you can't stomach insider trading, then don't take on short-term positions." That

said, Hayes has not publicly disclosed his own misconduct against his investors or that of his exchange.

58. Since its inception, BitMEX has flouted financial regulators worldwide for operating as an unregistered exchange, hiding behind its offshore status.

59. In 2018, the financial regulator for the province of Quebec, Canada, ordered BitMEX to close accounts linked to customers in Quebec because it was operating as an unregistered exchange.

60. In July 2019, the CFTC opened an investigation to determine whether the exchange is targeting and allowing U.S. traders to use the platform despite claiming not to allow them, after numerous press reports detailed the lack of any "know your customer" practices at BitMEX and the ease with which users can access the site from the United States—indeed, one New York journalist has detailed his use of BitMEX.

61. On March 3, 2020, the United Kingdom's Financial Conduct Authority issued a notice that BitMEX "is not authorised by us and is targeting people in the UK. Based upon information we hold, we believe it is carrying on regulated activities which require authorisation."

62. On October 1, 2020, the CFTC filed a complaint in the U.S. District Court for the Southern District of New York against BitMEX and Delo, Hayes, and Reed to enjoin their ongoing unlawful operation of a derivatives trading platform in violation of the CEA. *Commodity Futures Trading Commission v. HDR Global Trading Ltd. et al*., No. 20-cv-8132*, complaint filed*, 2020 WL 5845627 (S.D.N.Y. Oct. 1, 2020).

63. The CFTC alleges that BitMEX "has profited while illegally offering leveraged retail commodity transactions," failing to "compl[y] with the laws and regulations that are essential to the integrity and vitality of the U.S. markets." *Id.* at 2. Thus, BitMEX has allegedly failed to

implement rules to "achieve compliance with the core principles" required under the CEA. *Id.* at 15. The CFTC noted that, "[a]mong other critical issues," BitMEX has "failed to implement rules or procedures sufficient to ensure that[] the contracts it offers are not readily susceptible to manipulation; market participants are prevented from engaging in manipulation or disruptive trading; and market participants who engage in misconduct are subject to discipline." *Id.* The CFTC also noted BitMEX's misbehavior, including "actively delet[ing] required records including critical customer identification information," and failing "to establish rules to minimize conflicts of interest," noting that "Hayes, Delo, Reed, and numerous other BitMEX employees trade on the platform, and BitMEX's own internal 'market-making' desk has at times been one of the largest traders on the platform." *Id* at 16.

64. The CFTC also recognized that BitMEX's failure to comply with CFTC regulations was deliberate. The CFTC's complaint pointed to a 2015 investor presentation in which Hayes touted decisions designed (unsuccessfully) to prevent BitMEX from being governed by U.S. regulators. *Id.* at 25-26. Even though BitMEX received advice from consultants and investors noting the need to comply with regulations, BitMEX and its executives continued to act as if they were not subject to the CEA and its implementing regulations. *Id.* at 26-27.

65. Also on October 1, 2020, the United States Attorney for the Southern District of New York indicted Hayes, Delo, Reed, and Dwyer. This indictment alleged that these Defendants "willfully caused, aided, abetted, and conspired to commit violations of the [Bank Secrecy Act] at BitMEX." Indictment at 8. The indictment pointed to unsuccessful "affirmative steps" BitMEX took to exempt itself from the application of U.S. law. *Id.* at 9. It then noted that BitMEX rejected the adoption or implementation of "formal policies procedures, and internal controls for AML; independent compliance testing for AML; and training for appropriate personnel in AML." *Id.* at

10. This means that BitMEX "could not and did not monitor its customer transactions for money laundering and sanctions violations." *Id.*

66. On February 24, 2022, Hayes pleaded guilty in the Southern District of New York to violating the Bank Secrecy Act by willfully failing to establish, implement, and maintain an anti-money laundering program at BitMEX. In his guilty plea, Hayes admitted that there were BitMEX customers trading in Manhattan. In addition, the government's presentencing letter, which Hayes did not dispute, stated, among other things, that (i) "Hayes knew U.S. customers continued to access BitMEX through several means."; (ii) "BitMEX already had a significant number of U.S. users in September 2015 and made no effort to remove them."; (iii) "[Hayes] and his co-defendants did not actually bar U.S. IP addresses from the platform. Instead BitMEX only ran a single IP address check when new users created accounts, even though Hayes knew that users could easily avoid the initial check, including by using virtual private network services ('VPN') and then make subsequent logins from U.S. IP addresses."; (iv) "Hayes intentionally marketed to U.S. customers, including through his appearances on U.S. media outlets and through the BitMEX affiliate user program."; (v) "[Hayes] allowed some prominent users who he personally knew were U.S. persons to access and trade on BitMEX's platform openly."; (vi) "[U]sers whose accounts were closed because they had been flagged as from the United States could still open a new account, even if they used the exact same email address as the closed account."; and (vii) "[A]s late as July 2017, nearly two years after claiming to have banned U.S. users, Hayes received a report from [Defendant] Greg Dwyer, a BitMEX employee, that showed that the 'United States remains the most popular country by visits and average number of active users per day.'"

67. On March 9, 2022, Reed pleaded guilty in the Southern District of New York to violating the Bank Secrecy Act by willfully failing to establish, implement, and maintain an anti-

money laundering program at BitMEX. In his guilty plea, Reed admitted that he knew about the presence of U.S. users and himself operated BitMEX out of the United States, specifically working with U.S.-based traders. Specifically, Reed stated, "In September 2015, BitMEX announced a policy barring U.S. users. Despite this policy, I understood that some U.S. users still accessed the platform." Further, the government stated at the allocution, which Reed did not dispute, "Mr. Reed knew that BitMEX was serving thousands of U.S. customers and knew that BitMEX's purported controls were ineffective at preventing U.S. users from accessing and trading on BitMEX. Mr. Reed also knew that BitMEX had extensive U.S. operations, including an office in Manhattan."

68. On February 24, 2022, Delo pleaded guilty in the Southern District of New York to violating the Bank Secrecy Act by willfully failing to establish, implement, and maintain an anti-money laundering program at BitMEX. In his guilty plea, Delo admitted: (i) "In the autumn of 2015, we announced a no-U.S. user policy. Despite our policy, I have understood that U.S. users still found their way on to BitMEX. I knew this because would regularly find U.S. users and kick them off. I understood that other U.[S.] users were still present."; (ii) "In June 2018, we began tracking and logging U.S. IP log-ins and did not immediately act to restrict trading for this set of known U.S. users."; and (iii) BitMEX "had an office in Manhattan" and had "customers in Manhattan."

69. On August 8, 2022, Dwyer pleaded guilty to violating the Bank Secrecy Act by failing to establish implement, and maintain an anti-money laundering program at BitMEX, and aiding and abetting the same. In his guilty plea, Dwyer admitted: (i) "In the fall of 2015, I began working for BitMEX, an online trading platform which offers derivatives based on cryptocurrencies, such as Bitcoin, and which accepted Bitcoin as margin for customer positions. I served as head of business development at the company, among other roles."; (ii) "When I joined

BitMEX, I was residing in New York, and my work for the company, between when I started and the end of 2018, primarily took place in New York, including in Manhattan."; and (iii) "During my time working at BitMEX, I came to learn that even though BitMEX had a policy and certain controls in place to prohibit United States residents from trading on the platform, there were in fact United States residents trading on the BitMEX platform. For example, as part of my customer support role, I worked with United States residents from the platform when I became aware of them."

70. BitMEX's flouting of financial regulators is consistent with the lawless attitude of its founders, as Defendant Hayes has freely admitted to falsifying banking documentation in China in order to take advantage of arbitrage opportunities in the price of bitcoin. HDR was incorporated in the Seychelles based upon Defendant Hayes' stated belief that it would cost less to bribe Seychellois authorities—just "a coconut"—than it would cost to bribe regulators in the United States and elsewhere.

### 3. Operation Of BitMEX And Its Derivatives Products

71. BitMEX is not the only entity that offers bitcoin or ether swaps and futures. BitMEX, however, deliberately structures its products and operations with features more akin to a casino, focusing on products that expose its customers to greater volatility and an increased risk of loss.

72. In order to understand how BitMEX's products were designed to expose customers to risk and ultimately to be subject to manipulation, it is helpful to consider one of BitMEX's earliest and still most popular product: the XBTUSD Perpetual Swap or Perpetual Contract[6] which

[6] BitMEX's website uses the term "Perpetual Contract" and "Perpetual Swap" interchangeably.

BitMEX describes as "the most traded cryptocurrency product of all time," as over two trillion have been sold.

73. This product, which is fundamentally a swap, allows traders to buy or sell a contract that tracks the price of the exchange rate between bitcoin and the U.S. Dollar: If you buy the contract, you will make a profit if the price of bitcoin goes up in U.S. Dollars. Conversely, if you sell the contract, you will make a profit if the price of bitcoin goes down in U.S. Dollars—effectively a short sale on the price of bitcoin. A purchaser of XBTUSD thus acquires the financial risk associated with a future change in the exchange rate between bitcoin and the U.S. Dollar, but does not acquire any current or future direct or indirect ownership interest in bitcoin. XBTUSD thus tracks the definition of a "swap" under the Commodity Exchange Act. *See* 7 U.S.C. § 1a (47)(A)(iii) (defining "Swap" to include a "contract" that "provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more…commodities" and that transfers, "in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset").

74. As BitMEX's website recognizes, the XBTUSD Perpetual Swap "is similar to a traditional Futures Contract, but has a few differences." BitMEX accordingly lists XBTUSD among its Perpetual Swaps/Perpetual Contracts, and <u>not</u> among its Futures Contracts. Unlike a typical futures contract, XBTUSD has no set expiry date. Further, unlike a traditional futures product, the XBTUSD Perpetual Swap price closely tracks the price of the underlying asset, bitcoin. Put differently, in a traditional futures market, there are separate prices for the futures product and for the underlying asset. For example, if ACME Corp. is trading at $100 a share today, the contract to buy one share of ACME Corp. three months from now might trade at $110. By

contrast, XBTUSD tracks the price of bitcoin by exchanging among contract holders that are long (or short) a "funding rate" every eight hours if the price of bitcoin is higher (or lower) than what the contract is trading for on BitMEX. These mechanics incentivize buying the contract when the price of the contract is lower than the price of bitcoin, thus raising the contract's price, and vice-versa. Therefore, when the price of one bitcoin is $100, an XBTUSD Perpetual Swap contract will generally also sell for $100. The "funding rate" amount depends on the spread between the XBTUSD contract price and the referenced exchange rate. The funding rate is exchanged directly peer-to-peer among contract holders.

75. Other BitMEX contracts follow similar structures. BitMEX's two most popular types of contracts are Bitcoin or "XBT" derivatives and Ethereum or "ETH" derivatives. In particular, the ETHUSD swap functions analogously to XBTUSD, but tracks the exchange rate between the US. Dollar and ether, rather than bitcoin. BitMEX also offers several other swap and other contracts that allow traders to buy or sell a contract that tracks the price of the exchange rate between particular cryptocurrencies and the U.S. Dollar.

76. To determine the "price" of a given crypto-asset for the calculation of the funding rate for a perpetual contract based on it, BitMEX looks to other exchanges that allow customers to trade that crypto-asset directly. BitMEX employs an automated process that collects and weighs prices from these other exchanges to determine the BitMEX price. During most of the Class Period, BitMEX used a very small number of reference exchanges, making the BitMEX prices more volatile and more susceptible to manipulation.

77. BitMEX allows customers to buy or sell these contracts using a number of different order types. In addition to market orders that are executed immediately, BitMEX also offers Limit Orders, Stop Orders, and Take Profit orders, all of which respond to specific pricing conditions set

by the user; these orders either come into existence or are removed from the order book when a specific pricing condition is met. BitMEX also allows all three of these order types to be "Hidden," meaning that they will not be visible to other users. Normal market participants cannot identify these contracts by looking at the list of open orders, but hidden orders will trigger when their conditions are met. These orders are useful to customers who do not want to signal their trading intentions to the market as a whole. For example, if a trader possesses a large number of XBTUSD contracts that they want to sell when the price reaches $1,000, public knowledge of the anticipated sale might decrease prices; by keeping this trade hidden, the trader avoids this undesirable effect.

78. BitMEX goes even further to allow its traders to hide information by allowing "iceberg orders", which are mostly hidden orders that are partially visible. Thus, a trader can issue an order that will buy 100 XBTUSD contracts with a limit price of 100, but tell the market that he will only purchase 10 such contracts. This option is appealing for traders who wish to create the illusion of activity in the event that other traders are monitoring trades as they are completed. For example, if there is a hidden order to buy up to 100 XBTUSD at $100 and 10 XBTUSD are available at that price, the XBTUSD will be purchased even though no buy order at that price was public. A very savvy trader could realize that this order had been hidden and deduce the likely presence of additional hidden volume. An iceberg order in this situation would mask the volume of the outstanding order. This masking is thus beneficial to the trader purchasing an order because it prevents other traders from seeing the full extent of orders in the market. BitMEX customers thus navigate a highly complicated market in which only a portion of the market activity is publicly visible.

79. To draw customers with the promise of casino-like returns, BitMEX allows traders to leverage their position up to 100 times the amount of collateral, or "margin," they post. Put

differently, traders can buy or sell 100 bitcoin worth of XBTUSD contracts for only 1 bitcoin of collateral. This leverage magnifies both gains and losses: if the price of the XBTUSD goes up, a buyer who is 100X leveraged will experience 100 times the profit, but if the price declines even 1 percent, the buyer will have lost all his collateral. In this way, BitMEX structures its products to offer the allure of large, lottery-ticket payoffs at an apparently low cost.

80. On July 28, 2020, BitMEX emphasized these alluring high-leverage trades, rebranding to make its parent entity the newly formed "100x Group," reinforcing the 100x leveraged trades that draw in customers and expose them to a high risk of total loss.

81. One way in which BitMEX benefits from these highly leveraged trades is that its fees are calculated based on the leveraged position, not on the underlying collateral. Thus, where BitMEX advertises a fee of 0.075 percent for the XBTUSD Perpetual Swap, that percentage refers to the amount of the unleveraged position. For a 100X leveraged derivative, BitMEX actually charges a fee of 7.5 percent.

82. BitMEX attempted to make these highly leveraged trades more appealing to its customers by promising to cap their liability. To do so, BitMEX relies on a system that limits losses to the collateral through automatic liquidation. Using a computer program known as a liquidation engine, BitMEX automatically closes any position with unrealized losses equal to half of the amount of the posted collateral.

83. BitMEX describes this policy as designed to prevent losses greater than the collateral posted by the trader and to ensure that the winner receives their full profits. But under the guise of capping losses, BitMEX uses this liquidation system to lure traders into a false sense of security. As discussed below, BitMEX's system encourages traders to place highly leveraged bets under this pseudo-protection but instead takes their money in liquidations.

### 4. BitMEX's Automatic Liquidation System And The So-Called "Insurance Fund"

84. BitMEX's model encourages its users to experience volatility disproportionate to their collateral. The lynchpin to this is BitMEX's automatic liquidation system. The system is the brainchild of Defendants Delo and Dwyer, who designed and conceived it. The automatic liquidation system, however, does more than liquidate positions with insufficient collateral—it also creates substantial profits for BitMEX at the expense of its customers.

85. Ostensibly, in order to prevent winners from being adversely affected by the lack of a counterparty's collateral, BitMEX agrees to cover their winnings. In exchange, it automatically takes the loser's collateral. It then seeks to sell the position on the market at the best price available, with the purchaser stepping into the shoes of the liquidated party with responsibility for covering the counterparty's profits after sale.[7] This process of taking the loser's collateral in exchange for covering the winner's profits until a counterparty is found is accomplished through the automatic liquidation system.

86. BitMEX, however, does not wait to liquidate until the collateral can no longer cover the losses. Instead, for highly leveraged trades, it liquidates when the collateral is still worth approximately twice the losses incurred, even though the trader has half of the initial collateral remaining. Even if the system is able to find a price for the position after the liquidation that would have allowed the trader to recoup some losses, the trader receives nothing. Instead, BitMEX pockets that recovery for itself and puts it into its "Insurance Fund."

---

[7] If it is possible to make such a sale, the purchaser steps into the shoes of the liquidated party, such that the counterparty is in no way affected by (or even aware of) the liquidation of the other side. The new purchaser can be leveraged and is in turn subject to potential liquidation as well. Only if no such trade is possible are both of the original positions liquidated.

87. To use an example derived from information available on BitMEX's website,[8] consider a trader who has taken a long position on 100 ether using only 1 bitcoin as collateral while bitcoin and ether are each trading at $4,000. This trader is 100X leveraged, such that a rise in the price of ether by $10 will cause the trader to gain $1,000. Because of this level of leverage, the trader runs a substantial risk of not being able to pay off an unsuccessful contract; his collateral can absorb only a $40 decrease in the price of ether. The price at which the trader's collateral can no longer cover the losses on the position is the "bankruptcy price." In this example, the bankruptcy price is slightly over $3,960, as ether falling to that price would mean that the one bitcoin used as collateral would exactly cover the losses. Rather than using this bankruptcy price as the liquidation point, BitMEX imposes a "maintenance margin," commonly between 0.5 percent and 1 percent. If the margin is 0.5 percent, the position will automatically be liquidated if the price of ether falls to $3,980. This maintenance margin is remarkable relative to the amount of leverage in the position, as a change of one half of one percent in the price of bitcoin will result in an automatic liquidation.

88. If the price hits $3,980 and this liquidation occurs, BitMEX will seize the collateral and then seek to sell the 100-ether position to another customer, while covering the gains and without terminating the contract of the original counterparty. If this sale occurs at a price of $3,978, reflecting a $2 bid-ask spread, the position as a whole will have incurred a loss of $2,200 against the initial $4,000 wagered—a $22 loss multiplied by the 100x leverage. BitMEX, which takes the full collateral, has accordingly profited $1,800 from the liquidation of its customers' position and

---

[8] This example has been modified from the one on the BitMEX website only in that the position in question is tied to ether rather than bitcoin—this change simplifies the mathematics by preventing price movements from affecting the value of the collateral but does not materially affect the outcome.

places this profit in the Insurance Fund. The trader, meanwhile, loses the full $4,000. This scenario is summarized in the chart below:

| | **Customer** | **Counterparty** | **BitMEX** |
|---|---|---|---|
| ether price decreases<br>$22 before a purchaser is found | $0 | $22x100=$2,200 | -$22x100 = -$2,200 |
| BitMEX seizes 1 bitcoin of collateral | -1 bitcoin (value: $4,000) | $0 | +1 bitcoin (value: $4,000) |
| Net gain/loss | -$4,000 | +$2,200 | +$1,800 |

89. The profitability of the Insurance Fund is thus tied to the liquidity of the market—as BitMEX itself has stated, the Insurance Fund will profit from each liquidation as long as the bid-ask is smaller than the maintenance margin.

90. Although BitMEX calls this fund an "Insurance Fund," BitMEX has not recognized any legal obligation to maintain any particular amount in reserve or to use the reserve for only specified purposes. At any time, BitMEX can empty some or all of the Insurance Fund for any purpose it chooses. Hayes himself has acknowledged the punitive nature of the liquidation system:




**a. BitMEX Profits From Its Liquidations**

91. The structure of BitMEX's liquidation system means that it almost always profits BitMEX to liquidate a position. For BitMEX to lose, the market has to be so illiquid that a position that is halfway to being so unprofitable that it consumes the posted collateral declines further until it completely consumes the collateral before BitMEX can sell. In the vast majority of cases in which there is sufficient liquidity, BitMEX will profit when it liquidates the position of one of its customers.

92. Accordingly, BitMEX's Insurance Fund shows consistent and substantial overall profit from these liquidations. As their own data shows, the Insurance Fund has grown every year, as BitMEX takes in far more from liquidating its customers' positions than it pays out to cover contracts it cannot close quickly enough, providing an enormous source of profit beyond the commissions it charges. In fact, the Insurance Fund grows in value nearly every day: over the 100 days preceding January 25, 2021, it began only 15 of them with a balance less than it began on the day before. In fact, as of January 25, 2021 the Insurance Fund contained 37,318 bitcoin,

representing approximately 0.2 percent of the total bitcoin in circulation. Moreover, BitMEX partitions the fund by contract type, and, when no more contracts of a given type remain (because, for example, the contract was tied to a time period that expired), the portion of the Insurance Fund for that contract type is retained by BitMEX as profit.

93. This relationship has been established through quantitative expert analysis. By comparing the number of recent liquidated positions to the growth of BitMEX's Insurance Fund, this analysis has concluded that, on average during the period between July 26, 2019, and January 25, 2021[9], the growth of the Insurance Fund increased by 0.78 bitcoin for every position that was liquidated in a given day, with BitMEX liquidating an average of 311 positions a day—equating to a *daily* increase in the Insurance Fund of over $11,300,000, at bitcoin's current price.

**b. BitMEX Liquidates More Positions And Grows Its Insurance Fund More Quickly When There Is More Volatility**

94. Because BitMEX liquidates positions when they are sufficiently out of the money, even if for only a very short period, it profits from high volatility. In a highly volatile market, more traders will hit their liquidation points and be liquidated. If a market vacillates sufficiently, both long and short traders may be liquidated in a day that saw relatively little ultimate movement (*i.e.*, a day with significant intra-day price movement). Because of the high leverage used by BitMEX traders, even transitory swings of one percent in each direction can cause liquidations. This extreme sensitivity to volatility makes the BitMEX exchange an attractive target for manipulation by its corporate insiders who can profit from liquidations through its Insurance Fund.

95. The relationship between volatility and liquidations has become evident through an expert statistical analysis of liquidations and the volatility of the popular XBTUSD Perpetual

[9] Liquidation data from before July 26, 2019 is not publicly available.

Swap. As the below graphic makes clear, liquidations follow volatility almost in lockstep; this result is significant to a 95 percent confidence level.




96. The correlation between volatility and liquidation volume is also illustrated in the below graphic. This image displays the volatility of bitcoin price on the x-axis and the number of positions liquidated on the y-axis. The tight fit of the line to the data and the positive slope show a high correlation coefficient of 0.84 from July 2019 to January 2021, based on available data, between bitcoin volatility and liquidations. The result is statistically significant to a 95 percent confidence level.




97. Because liquidations are more common during periods of high volatility and because BitMEX profits from the majority of its liquidations, we would expect to see the Insurance Fund grow as volatility increases. Sure enough, expert analysis has revealed that this relationship holds. During periods of high volatility, the insurance fund grew more than 44 percent faster than it did generally, and more than twice as fast than it grew in periods of low volatility. A true "insurance fund," by contrast, if it were serving a legitimate insurance function, would generally decline in periods of higher volatility, not increase. The fact that the BitMEX Insurance Fund systematically and predictably *increases* in periods of higher volatility provides statistical support that it is a fraudulent device designed to enrich the owners of BitMEX at the expense of its customers.

**c. The Growth Of The Insurance Fund Is Driven By BitMEX's Profiting Off Of The Vast Majority Of Liquidations, Rather Than A Legitimate Goal To Insure Against Loss**

98. The growth of the Insurance Fund cannot be justified by the increased need for insurance based on increased trading volume. As an expert quantitative analysis has revealed, the Insurance Fund has grown much faster than the trading volume on BitMEX. The below graphic indicates that while BitMEX's trading volume has increased, the Insurance Fund has grown far more rapidly. The ratio between the Insurance Fund and the value of the positions increased sharply since 2017. In 2017, every bitcoin in the Insurance Fund supported 240 bitcoin of daily trading volume. By 2020, the bloated Insurance Fund had one bitcoin for every 7 bitcoin of daily trading volume.




99. BitMEX has thus profited from the vast majority of the automatic liquidations it conducts on behalf of its customers. The structure of BitMEX's automatic liquidations creates an incentive for BitMEX to induce liquidations as long as there is sufficient liquidity in the market that the bid-ask spread is smaller than the maintenance margin. As long as this liquidity is present, BitMEX profits when it causes its customers' positions to liquidate.

### 5. BitMEX's Servers Routinely "Lock Out" Customers, Preventing Them From Trading On Their Accounts While Bitmex Liquidates Their Positions

100. BitMEX routinely disadvantages its customers through server "lock-outs" during which customers cannot access their accounts. Defendants claim that technical issues in BitMEX's server, not found in other exchanges, locked out users at crucial times. These lock-outs, however, enabled BitMEX to profit through its Insurance Fund by liquidating customer accounts that could not trade.

101. BitMEX's risk-management process, which performs the system's automatic liquidations, must check the entire system whenever the price of a future changes. This process, although sometimes completed quickly, is the supposed cause of BitMEX's servers freezing on average between two and three times a day. During these server freezes, customers are locked out of their accounts and lose the ability to trade until the servers unfreeze.

102. When BitMEX's servers are frozen, preventing customers from executing any trades, the prices of the derivative contracts are *not* frozen — trades and liquidations occur even while customers are locked out of their accounts. BitMEX continues processing certain previously placed transactions while refusing to accept transactions from others. This means that a Class member can be prevented from executing a trade by a server freeze only to find, once the server reopens, that the price at which they sought to transact is no longer available. Class members can also find that an offer they had made before the freeze but sought to retract during it has since been accepted.

103. BitMEX's server freezes also enable automatic liquidations, which are profitable to BitMEX, because these liquidations continue to occur during the freeze. A customer who has a 100X leveraged position on 1 bitcoin that will liquidate if the price of bitcoin falls from $4,000

to $3,980, for example, would be expected to sell when the price hits $3,985, accepting a loss of $1,500 but retaining the remaining capital of $2,500. If the frozen servers prevent this sale from transpiring, however, the customer will lose all of her capital when the price hits $3,980. Such a scenario profits BitMEX, which pockets the capital.

104. BitMEX could remove the potential for these manipulative actions and prevent users from suffering from periods of denied access to a moving market by prohibiting its system from processing any transactions during these freezes. Instead, BitMEX has deliberately built a system that profits from the liquidations that predictably occur while its customers are unable to escape unfavorable positions.

105. BitMEX's server freezes and lock-outs are not a result of unavoidable technical limitations. Similar server issues are not present in other exchanges that regularly handle far more transactions per second.

106. While BitMEX has not made all of the data about its server capacity public, it has indicated that, as of May 2019, it was processing around 200 million trades per week, purportedly taxing its system and leading to server shutdowns. This equates to an average load of around 330 trades a second. BitMEX has indicated that its peak transactions can reach 30 times the average, for a peak of just under 10,000 trades a second. ByBit, which also transacts primarily in derivatives, can process 100,000 transactions a second. Binance, another large exchange, can process 1.4 million transactions a second, more than 100 times the peaks that purportedly cause BitMEX's servers to freeze. These exchanges have not experienced the pattern of repeated and sustained freezes that have become commonplace on BitMEX, and BitMEX has provided no explanation for why its servers are supposedly so inadequate.

107. The server freezes on BitMEX are demonstrably not caused by server load, as shown by a statistical analysis of transaction volume. For example, on May 12, 2019, BitMEX announced a new record of over $10 billion in transaction volume, with no server incidents reported that day.

108. Expert analysis shows that the average number of trades surrounding server freezes falls below the top 23rd percentile of total trading volume relative to BitMEX's historical averages; in other words, the average volume before a freeze would not be a notably busy day for BitMEX. Additionally, fewer than 10 percent of the server outages reported by BitMEX occurred during periods when BitMEX trading volume was in the top 5 percentile of BitMEX trading volumes. As illustrated by the graphic below based on analysis of freezes from March 1, 2018, to January 26, 2021, most of BitMEX's freezes do not come at periods of high transaction volume:




109. BitMEX's servers are thus not freezing because of high volume, which would be the case if the freezes were a consequence of deficient servers. While promoting its trading platform as best-in-class, BitMEX has recklessly or intentionally failed to disclose the susceptibility of its platform to these freezes and their predictable, negative effects on customers—and beneficial effect for BitMEX.

110. During much of the Class Period, in its terms of service BitMEX warned only that a customer's own Internet service might experience a disruption. Only in early 2019 did BitMEX finally disclose to customers, and only vaguely, that undefined system overloads might disrupt access to the trading platform. But even this disclosure failed to disclose the frequency of system overloads, their relationship to volatility, their selective effect on only certain kinds of transactions, or the likelihood that they would harm customers to BitMEX's benefit.

111. By failing to disclose the risk of these freezes during high volatility, and the likelihood of their negative impact on customers, while simultaneously touting its ever-increasing volume and supposed technical sophistication, BitMEX deceived customers into trading by recklessly making misleading statements of material facts and omitting to state material facts necessary to make BitMEX's statements not misleading.

112. Just as fundamental, with respect to its disclosures since early 2019, BitMEX has at least recklessly claimed that it "shall make reasonable efforts to ensure that the Services are available to you" and that it "will use commercially reasonable efforts to avoid downtime of the Services during anticipated peak hours." As to any system overloads or freezes that BitMEX may not have initiated deliberately, BitMEX failed to use reasonable or commercially reasonable efforts to avoid them, and knowingly or recklessly claimed otherwise, further deceiving customers into trading on the platform.

113. In all of these respects regarding its server freezes, and in light of BitMEX's access to the occurrences on its own servers, BitMEX has either deliberately or recklessly employed an artifice to defraud its customers.

### B. BitMEX's Undisclosed Insider Trading Desk Uses Hidden Information to Trade Against BitMEX Customers and Manipulate its Prices in Order to Profit BitMEX.

#### 1. BitMEX Manipulates Its Prices and Secretly Trades Against Its Customers Using Accounts That Have Access To Hidden Information And Are Immune from Lockout

114. At the core of BitMEX's operation, but hidden from regular customers, was BitMEX's Insider Trading Desk. Former BitMEX employees have revealed to Plaintiffs that this trading desk, staffed by BitMEX employees, exploited unique functionality that it was granted to profit in its trades against BitMEX customers. This unique and hidden functionality afforded to the Insider Trading Desk meant that customers promised a fair playing field were in fact being manipulated by BitMEX itself. BitMEX used these powers to manipulate the prices of its Bitcoin and Ethereum derivatives.

115. As former BitMEX employees have revealed, between 2015 and 2016, Hayes approached Liquidbit, an over-the-counter crypto trading platform, about the possibility of building into the BitMEX platform a hidden trading desk that would be able to utilize functionality not available to other customers. Ultimately, before 2018, BitMEX reengineered BitMEX's foundational software to empower the operation of what it internally dubbed "Risk Management" or the "Internal Trading Desk."

116. The Insider Trading Desk was managed by Dwyer with at least three key employees, including Stuart Elkington and Nick Andrianov. This desk operated continuously throughout the Class Period to manipulate BitMEX and cause artificial prices for BitMEX derivatives, include derivatives of Bitcoin and Ethereum.

117. The traders at the Insider Trading Desk had a number of advantages that they exploited to profit BitMEX:

118. *First*, internal traders could view and exploit hidden information from other traders. As discussed above, BitMEX offered customers a number of different order types that purported to be "hidden." But these offers were not in fact hidden from BitMEX and its insiders. The operators of the Insider Trading Desk had what BitMEX internally referred to as "God Access" that allowed them to see all of the information of an account, including any hidden orders and the liquidation points for all orders. They were also provided with automated systems, built by BitMEX to enable their manipulation, that told them how the market was likely to move by assessing the impact of the hidden orders when they triggered.

119. The ability to see hidden orders was combined with the ability to see another crucial piece of hidden information: the leverage amounts and corresponding liquidation prices for customers' open positions. This information made it easy to profitably manipulate the market. If, for example, the Insider Trading Desk were to see that a number of short bitcoin derivatives are near their liquidation point, it could enter a large buy order. This order would cause the price of bitcoin on the BitMEX exchange to rise, triggering the liquidation of these swaps or futures. The liquidation would create a buy order for the liquidated contract, further increasing the price. Once this chain of liquidations had caused the price to rise far beyond the price at which the Insider Trading Desk made its initial purchase, it could sell bitcoin at this higher price to fulfill the forced buy orders. Because these trades are automatic, an insider desk could execute this trade very quickly and with a high confidence of success. The traders at the Insider Trading Desk had tools that showed them what liquidations would occur across the entirety of BitMEX's platform if prices moved in any given direction.

120. The access to hidden information thus provided the operators of the Insider Trading Desk with a substantial and secret advantage over BitMEX customers. By analyzing the impact of

hidden trade orders and liquidation prices, BitMEX insiders could determine when placing a large order would cause the hidden orders to trigger. BitMEX could then assess whether these hidden orders would affect prices in a way that would cause liquidations. These liquidations would very likely be profitable to BitMEX—because the price shift would be driven by BitMEX's own manipulative trade rather than legitimate market forces, it was likely to quickly reverse in time for BitMEX to sell at a profit.

121. But access to hidden information was not the only advantage possessed by BitMEX insiders. *Second*, the Insider Trading Desk was able to trade during server freezes and customer lock-outs. Even though BitMEX told its customers that these freezes were a consequence of technical limitations, these same limitations did not apply to BitMEX's internal traders. While its customers were unable to enter or withdraw orders, the Insider Trading Desk could trade freely.

122. Even standing alone, this ability to trade during server freezes would represent a massive, unfair, and undisclosed trading advantage. While normal traders were unable to withdraw their offers and orders, BitMEX traders would be able to exploit those positions. BitMEX traders could also look to prices on non-frozen exchanges, knowing that BitMEX prices would converge on market prices when the freeze ended.

123. For example, imagine that the servers freeze when the price of Bitcoin is $100. During the freeze, the price of Bitcoin rises to $105. The Insider Trading Desk, able to trade during the freeze, can purchase XBTUSD contracts that are valued at $100 from customers who cannot withdraw those offers in light of market movements. When the servers unfreeze, BitMEX would be holding XBTUSD contracts worth $105 to the detriment of the customers trapped in unfavorable positions during the freeze.

124. These two advantages enjoyed by the Insider Trading Desk—access to hidden information and the ability to trade during freezes—compounded each other to allow its operators to dominate their platform, and former BitMEX employees have revealed to Plaintiffs that BitMEX exploited these advantages to profit itself at its customers' expense. During a freeze, BitMEX insiders would analyze the hidden positions of normal customers in order to determine which moves would cause profitable liquidations. These insiders could perform these calculations with a high degree of precision because other market participants were frozen; the only transactions during the freeze would result from the BitMEX insiders themselves and the triggered orders that they had analyzed. Competing against transparent customer accounts frozen in place, BitMEX was able to profit at the expense of its customers.

125. BitMEX was not able to conceal its Insider Trading Desk forever. On April 28, 2018, an independent researcher requested comment from BitMEX regarding "information on record about insider accounts (possibly friends / acquittances of Bitmex staff) having special advantages over other Bitmex users." BitMEX responded the same day, denying that it gave "preferential treatment" to any "customers." This was false.

126. Just two days later, on April 30, 2018, BitMEX updated its terms of service and for the first time revealed that "BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform." BitMEX thus revealed that it had historically maintained a for-profit desk trading on its own platform, which was trading against its own customers. What it did not reveal, however, was that the Insider Trading Desk enjoyed massive advantages over regular customers and exploited those advantages to profit at their expense, including by inducing liquidations.

127. BitMEX also revealed that its trading desk had the monopoly on market making for its bitcoin options product. BitMEX hid the role of its trading desk by labeling the employee in charge of the desk as part of "Risk Management."

128. Almost immediately following this announcement, both BitMEX's General Counsel and outside counsel left the company. The General Counsel announced his resignation the following day, acknowledging to other BitMEX employees that he was doing so specifically because he was troubled by BitMEX's secret trades against its own customers. Within a month, BitMEX's outside counsel, Sullivan & Cromwell, had terminated its relationship as well.

129. Even after this public revelation, BitMEX has continued to operate a trading desk that exploited undisclosed advantages to profit at the expense of customers. In order to avoid detection, the employees of the trading desk use anonymized email accounts through Google's "gmail" platform to create accounts on the BitMEX platform and undertake the same secret anti-customer trading.

130. The internal trading desk is not even the only insider trading on BitMEX. Hayes himself trades on the platform, against BitMEX's customers. The customers on the other side of Hayes's contracts have no way of knowing that they are trading against an insider with access to non-public information about their trades, including their liquidation limits. Hayes has even gloated about the possibility of such misconduct: "The digital token trading markets like traditional forex markets are not regulated, and will struggle to be. Therefore, if you can't stomach insider trading, then don't take on short-term positions."

**2. BitMEX Manipulates Its Prices To Ensure Its Profit And Its Customers' Loss.**

131. In addition to placing strategic trades on its own platform using the Insider Trading Desk in order to liquidate its own customers, BitMEX further manipulates the prices of its

derivatives through strategic and unlawful trading of the crypto-commodities underlying its derivatives on reference exchanges.

132. During much of the Class Period, BitMEX deliberately used a relatively limited number of exchanges to price bitcoin and ether. For part of 2019, for example, BitMEX determined the price of ether by referring to just three exchanges: Coinbase, Bitstamp, and Kraken.

133. Relying on only a small number of exchanges provided BitMEX with an additional method of manipulating the prices of the derivatives it sold its customers. By making a series of orders to push the price up or down on a reference exchange, Defendants could create short-lived price fluctuations on BitMEX. Defendants actively manipulated prices on reference exchanges in order to enable its Insider Trading Desk to profit by liquidating customer accounts.

134. In order to facilitate this manipulation, BitMEX would transfer onto other exchanges bitcoins it had obtained through profitable trades on its own platform. BitMEX would then use those funds to buy or sell the referenced crypto-commodities on its reference exchanges. These purchases would then cause the price of the derivative on BitMEX to move towards the manipulated price on the reference exchange. This effect would be short-lived, however, as market forces would correct the price on the reference exchange. Defendants could thus cause short spikes or dips in the prices of BitMEX derivatives by manipulating reference exchanges.

135. BitMEX was uniquely positioned to benefit from these short fluctuations for at least two reasons. *First*, as discussed above and revealed by former BitMEX employees, BitMEX has access to all of the hidden information of its customers and trades against them on BitMEX's platform. BitMEX can therefore calculate which market movements would be profitable, either by making BitMEX money on its internal trades or by liquidating customer accounts at a price that would be profitable for BitMEX. Because BitMEX had unique tools that allowed it to determine

which market movements would profit BitMEX by liquidating its customers' positions or advancing its trades against its customers, it alone knew exactly how to move its reference exchanges to maximize its profitability.

136. *Second*, BitMEX's liquidation system enables it to profit from manipulation that would not be profitable to normal traders. A normal trader will struggle to profit from a series of purchases that temporarily increase the price of a crypto-commodity because, in selling the purchased asset to take advantage of the higher prices, the seller creates downward pricing pressure that deflates the prices. But BitMEX's liquidation system means that it can benefit from short-lived fluctuations. If BitMEX's trading desk's undisclosed access into consumer accounts indicated that there would be a profitable set of liquidations if the price of Bitcoin rose to $100 when it was currently at $95, then BitMEX could transfer funds to a reference exchange and pump the price of Bitcoin on that exchange. Even if BitMEX did not make money on the pump and dump itself, it would profit from the liquidations triggered by the price of Bitcoin briefly crossing that $100 threshold. Because BitMEX liquidates positions as soon as they cross a liquidation threshold, even short price swings can be profitable for BitMEX and harmful for its customers.

137. Defendants' manipulation can be detected through analysis of abnormal trading patterns on Bitstamp, one of the reference exchanges. As illustrated below, certain suspicious trading patterns were aligned with abnormal trading on BitMEX itself. Moreover, these instances occurred on days when BitMEX itself was particularly positioned to profit from them because Kraken, another reference exchange, was down for maintenance and unavailable for pricing derivatives on BitMEX.

138. For example, on May 17, 2019, bitcoin lost 20 percent of its value on Bitstamp for about 30 minutes before recovering. This flash crash followed a 15-minute period of particularly

abnormal trading activity on Bitstamp and BitMEX. From approximately 2:55 to 3:10 AM (UTC)[10], an unusually large volume of 3,071 bitcoin were sold on Bitstamp. In contrast, during the previous day, only 83 bitcoin were sold every 15 minutes on average.

139. This unusually large volume of sell orders caused the price of bitcoin on Bitstamp to fall precipitously from $7,730 to $6,178—a decline of 20 percent over the course of only 15 minutes. At 3:10 AM, the volume of sale orders suddenly normalized, leading to an abrupt reversal in the price of bitcoin, in which it recovered to $7,350, an increase of 19 percent, during the following 2 to 15 minutes. As shown below, this unusual trading activity on Bitstamp had an immediate and significant impact on the price of the XBTUSD Perpetual Swap on BitMEX, given that BitMEX uses Bitstamp as one of only three reference exchanges for the price of that contract.




140. The short volume of the BitMEX XBTUSD Perpetual Swap spiked during this period, in a pattern highly similar to that observed with the Bitstamp sales volume. The volume of short sales on BitMEX began at about the same time as the aggressive sales on Bitstamp (2:55 AM), although the short volume on BitMEX was larger than on Bitstamp, and continued at that

[10] Unless otherwise specified, all times refer to Coordinated Universal Time.

high level up until 3:10 AM. On BitMEX, however, there was an abrupt halt to the shorting activity at 3:10:49 AM, before resuming at a significantly lower level at 3:12:33 AM, as the price of bitcoin and the XBTUSD Perpetual Swap recovered. During this 104-second period with no shorting activity on BitMEX (the grey area in the figure below), the price of bitcoin on Bitstamp immediately recovered to above $7,000, before temporarily falling back to $6,699, when a lower volume of shorting activity resumed on BitMEX. After that time, the price of bitcoin and the XBTUSD Perpetual Swap quickly recovered again to approximately $7,350 over the following 8 to 10 minutes. This pattern demonstrates a high degree of correlation, and likely coordination, between the shorting activity on BitMEX and Bitstamp.




141. The relative timing of the short sales on BitMEX and the sell orders on Bitstamp also supports the conclusion that the trading likely involved cross-market manipulation. During this time period, a large increase in short positions on BitMEX was often followed by a large sell volume of Bitcoin on Bitstamp. The below figure shows the exact timing of short sales on BitMEX and the sell volume on Bitstamp during the 1 minute period between 3:08:05 AM to 3:09:05 AM.

The short position on BitMEX spiked at 3:08:13 AM; three seconds later, 12.5 bitcoin were sold on Bitstamp. Large volumes of BitMEX short sales also occurred at 03:08:26, 03:08:36, 03:08:47, 03:08:51, and 3:08:58. All of these sales were followed by large sell volumes of bitcoin on Bitstamp within a few seconds. This would be consistent with a trader placing short orders on BitMEX in order to profit from a drop in prices from their subsequent sales of bitcoin on Bitstamp. Within this single minute, more than 100 bitcoin (worth more than $600,000 at the time) were sold on Bitstamp, causing the price of bitcoin to drop by 2 percent.




142. Because this manipulation led to high but short-lived volatility, most possible manipulators could not have benefitted. A regular trader, even assuming they had the resources to engineer such manipulation, would have struggled to benefit from the dip before it reversed itself. Instead, they would likely have lost money, having sold at a below-market price and unable to enter new orders in time to capitalize on the dip before it recovered.

143. BitMEX, however, profited substantially from these manipulated market movements. The high volatility in the price of the XBTUSD Perpetual Swap on BitMEX resulting from this unusual trading behavior caused an unusually large volume of customers' contract liquidations on BitMEX. As shown below, the Insurance Fund increased by 750 bitcoin, with a value (at the time) of approximately $5.4 million. In comparison, the average daily increase in the Insurance Fund was 140 bitcoin during the week before the event, and 49 bitcoin on a daily average basis during the week after.

144. BitMEX, through its Insurance Fund, was therefore uniquely positioned to earn large profits from the high volatility of bitcoin prices on Bitstamp that occurred over this 30-minute period on May 17, 2019, in addition to any trading profits that either BitMEX or its principals may have earned as a direct result of the price manipulation on the two exchanges.




145. On other days during which when Kraken was undergoing scheduled maintenance, similarly suspicious trading activity occurred on Bitstamp and BitMEX. For example, on July 14, 2019, Kraken was down for maintenance—thus increasing the weight of Bitstamp on BitMEX's derivatives products. On that day, the price of ether dropped dramatically due to the sell order on

Bitstamp by a single user, causing $164 million worth of liquidations on BitMEX. Again, only BitMEX was in a position to profit from this manipulation.

146. Indeed, BitMEX has consistently profited from suspicious Bitstamp trading that triggered volatility and liquidations on BitMEX. For example, as shown in the figure below, on September 24, 2019, the price of bitcoin on Bitstamp fell 14 percent, from $9,500 to $7,998, between approximately 6:00 PM and 7:45 PM. The fall was caused by the sudden appearance of an unusually large volume of sell orders on Bitstamp, including unusually large individual sale orders. For example, in a two second period at 6:34 PM, 88 bitcoin, worth more than $800,000, were sold on Bitstamp. This sale was followed 10 minutes later by an unusually large volume of short sales on BitMEX. After falling to a low of $7,998 at approximately 7:45 PM, the price of bitcoin rapidly recovered to $8,500 by 8:45 PM, and to $8,600 around 9:30 PM. The resulting volatility of bitcoin prices caused the BitMEX Insurance Fund to increase by 22.5 bitcoin, worth $193,000, on that day.

**Bitcoin and XBTUSD prices on Bitstamp and BitMEX, bitcoin volume on Bitstamp: September 24, 2019**



147. Similarly, on March 12–13, 2020, the price of bitcoin and the XBTUSD Perpetual Swap on BitMEX also exhibited an unusually high level of volatility, as shown in the figure below. From 10 PM on March 12 to 2 AM on March 13, 2020, the price of bitcoin on Bitstamp dropped 38 percent from $5,800 to $3,600. At 10:27:46 PM, 401 bitcoin, worth $2.3 million, were sold within one second on Bitstamp. This sale was accompanied by an unusually large volume of short sales on BitMEX during the following hour. The XBTUSD Perpetual Swap price on BitMEX reached a low of $3,600 at 2:15:25 AM on March 13, 2020. The BitMEX trading system then experienced a complete outage between 2:33 AM and 3:00 AM, during which time the price of bitcoin rapidly increased again on Bitstamp. BitMEX liquidated an estimated $5.8 billion worth of positions during a 2.5-hour window containing this outage. By approximately 10 AM on March 13, 2020, the price of bitcoin had recovered to approximately $5,800. As a result of this volatility, and the extended outage of the BitMEX trading system during much of this volatility, the BitMEX Insurance Fund increased by over 2,600 bitcoin, worth $15 million.

**Bitcoin and XBTUSD prices on Bitstamp and BitMEX, bitcoin volume on Bitstamp: March 12–13, 2020**




148. These instances of manipulation were uniquely structured to profit BitMEX at the expense of its customers. BitMEX knew exactly what changes would cause the most liquidations, and its liquidation system meant that it profited from even very brief periods of high volatility it generated.

### C. BitMEX Profits by Freezing its Servers and Trading Against Its Customers In Order To Liquidate Their Positions

#### 1. BitMEX Freezes Its Servers As A Tool To Maximize BitMEX's Profit At The Expense Of Its Customers

149. The timing of server freezes on BitMEX is not random. The most important and profitable time for BitMEX to freeze, as shown, is during a period of high volatility; freezes during high volatility periods allow BitMEX insiders to liquidate more customers through strategic trading. Because volatility allows it to profit from liquidations, BitMEX is incentivized to freeze its servers during periods of high volatility, allowing BitMEX to liquidate positions while

customers are locked out. The evidence compels the conclusion that BitMEX has consistently acted on those incentives.

150. In particular, expert statistical analysis conducted of the freeze periods reported on BitMEX's website has revealed that the probability of outages is *876 percent* higher when the volatility of Bitcoin prices is in the top one percentile. The result is statistically significant at a 95 percent confidence level.

151. The relationship between periods when BitMEX freezes its servers and when high volatility enables mass liquidations is shown by the below chart prepared through expert analysis. The red lines indicate periods when servers were frozen, while the height of the blue bars indicate the volatility of bitcoin during each period. As the chart displays, the freezes (indicated by the red stripes) most often occurred during the highest periods of volatility when BitMEX could effectively liquidate positions:



152. That the timing of its server freezes maximizes BitMEX profits is reflected in a quantitative analysis of the relationship between server freezes and the growth of the Insurance Fund. That quantitative analysis revealed that, over a three-year period, the Insurance Fund grew *over three times as fast* on days with a server outage than in the surrounding days without a server outage.

**2. BitMEX Freezes Its Servers To Protect Itself From Losses**

153. BitMEX also freezes its servers at the expense of its customers to protect itself from losses. This sort of defensive freeze was demonstrated on March 12, 2020. On that day, the price of bitcoin fell from $7,200 to a 10-month low of $5,678 in just 15 minutes, and continued to fall from there, ultimately dropping below $4,000. As the price plummeted, BitMEX automatically liquidated over *$700* million of its customers' positions.

154. While liquidations are generally profitable for BitMEX, rapid and sustained movement in one direction threatens major losses for the Insurance Fund. If the price of Bitcoin were to continue to fall, bid-ask spread would become so great that BitMEX could not sell the liquidated positions above their bankruptcy price, causing losses that are designed to be covered by the Insurance Fund. This sort of event is exactly why BitMEX claims to maintain the Insurance Fund—BitMEX is supposed to draw from the fund to cover its losses under these circumstances.

155. As prices fell, however, BitMEX did not immediately sell the positions it obtained through liquidation orders at a loss to its Insurance Fund. Instead, it kept its newly acquired positions open, allowing it to profit from liquidations if prices rose, while also creating a new risk that further declines would exacerbate the losses. This decision created economic liability for BitMEX unless the fall in bitcoin prices stopped and began to recover. This is when BitMEX's servers froze, supposedly due to technical limitations rather than BitMEX's economic interests.

156. The servers were only restored after Bitcoin's price had stabilized, preventing the need for BitMEX to meaningfully deplete its Insurance Fund. Over the next day, BitMEX gradually resold the positions it had acquired through liquidation and the Insurance Fund had hit a new high. But this recovery was not passed along to the traders who had hit their margins during the crash, including those who were unable to exit their positions because of BitMEX's supposedly frozen servers; they received nothing to compensate them for their $700 million in liquidated assets. In short, a perfectly timed server outage substantially mitigated a potential major loss for BitMEX's Insurance Fund and helped it hit a new high the next day, while disadvantaging its own customers.

157. BitMEX first blamed the server shutdown on "a hardware issue with our cloud service provider," before Defendant Reed later claimed, with no support, that the server failure was the result of an attack by a "botnet." Mr. Reed promised to provide further explanation "in the coming days" but has yet to disclose any additional information nearly a year later.

158. This server freeze, like the others designed and intended to profit BitMEX by allowing it to liquidate customers locked in unfavorable positions, was not random or a technical glitch. It was a deliberate decision designed to protect BitMEX's Insurance Fund at the expense of its customers.

### 3. The Experiences of Class Members Illustrate The Harm Resulting From BitMEX's Manipulative Practices

159. The intersection of BitMEX's casino-like structure, punitive liquidation system, and manipulative freezes are amply illustrated by the experience of Class members, who invested in derivatives products offered by BitMEX, motivated by the potential for rapid gains enabled by BitMEX's highly leveraged structure. These plaintiffs, including Plaintiff Lufkin, fell victim to having their positions liquidated on days when BitMEX's servers froze. If the servers had not

frozen, members of the Class who experienced server freezes could have sold off these positions to protect against the liquidation of their capital.

160. For example, Class member Brett Messieh experienced several liquidations during BitMEX server freezes. On each of these occasions, the servers froze during a period of high volatility, and, when it unfroze, Mr. Messieh's position had been liquidated because of intervening price movements, which Mr. Messieh was powerless to prevent because of the freeze. If the servers had not frozen, Mr. Messieh could have sold off these positions to protect against the liquidation of his capital. Even when Mr. Messieh attempted to protect against this possibility by creating stop loss orders that were intended to automatically sell his position when it reached a certain level, the position was nonetheless liquidated during a server outage and the stop loss was ignored while BitMEX rapidly liquidated his position.

161. Mr. Messieh reached out to BitMEX support on this issue on July 16, 2018, in an email with the subject line "Server Crash During Run Up..." That email read as follows:

> Hi,
>
> The Bitmex servers crash kept me from being able to close my position and caused liquidation while I was unable to access Bitmex at all... Will there be any remedy for this or a roll back of any kind? It's very frustrating to have this happen at such a pivotal moment and isn't fair to customers who trust Bitmex. Thanks for your time and please let me know if there's a way to solve this issue. I would've been able to market stop and save 0.4 XBT if Bitmex didn't crash.

162. BitMEX responded only with a form email, refusing to provide any compensation or future protection to Mr. Messieh:

> Hi bmbrett,
>
> We are aware of the issue and working hard to resolve it. Our systems have been restored.

> Unfortunately we cannot offer any compensation or perform a rollback.
>
> Please see our terms: https://www.bitmex.com/app/terms#7-Service-Performance
>
> Ticket: https://bitmex.freshdesk.com/helpdesk/tickets/125642
>
> Kind Regards,
>
> Stefan
>
> BitMEX

163. Mr. Messieh's experiences were typical of those who were unable to protect their positions from liquidation during one of BitMEX's many server freezes.

164. BitMEX never compensated Class members for their losses resulting from liquidations during server freezes. Nor did BitMEX disclose to customers that such server freezes had been and would continue to be deliberate; that BitMEX had failed and would continue to fail use reasonable efforts to prevent such server freezes; or that such server freezes would happen and consistently work to customers' detriment.

**D. BitMEX Is A Domestic Exchange**

165. The individual defendants' guilty pleas explain (*see supra* at ⁋⁋ 66-69) that for the entirety of the Class Period, BitMEX operated a trading platform that facilitated thousands of U.S. users to actively trade crypto swaps and crypto derivatives. BitMEX had a significant number of U.S. users in September 2015 and failed to remove them after the CFTC issued regulatory orders that month announcing its view that cryptocurrency is a commodity. For years Defendants knew that U.S. customers were accessing the BitMEX platform and trading BitMEX's derivatives products.

166. Beginning in 2017, BitMEX purported to prevent U.S. users from accessing its service. This limitation, however, has always been presented and recognized as a weak façade

intended to skirt liability from the many sales that BitMEX continued to actively solicit from the United States. In fact, BitMEX knew that between 20 and 30 percent of its users were located in the United States. BitMEX allows customers to open accounts with anonymous emails and passwords, and BitMEX does not collect any documents to verify the identity or location of the vast majority of its users. In reality, much of BitMEX's workforce and customer base were located in the United States as it solicited purchases from U.S. investors, rendering BitMEX a domestic exchange.

167. Defendant Greg Dwyer tracked the number of U.S. customers on the BitMEX trading platform and created a report, which he sent to Defendants. Greg Dwyer as part of his customer support role worked with United States residents that were trading on the BitMEX platform while he tracked data on thousands of U.S. customers on the BitMEX trading platform. The report stated, "United States remains the most popular country by visits and average number of active users per day," and analyzed data on U.S. users of BitMEX. Thereafter, monthly revenue reports were continuously circulated throughout BitMEX tracking data on the thousands of U.S. users on BitMEX. Dwyer also tracked the millions of dollars in profit Defendants generated as a result of U.S.-based trading on BitMEX. The government's presentencing letters, which the Individual Defendants did not dispute, stated that Hayes, Reed, and Delo received those reports from Dwyer, yet willfully facilitated thousands of U.S. customers actively trading on BitMEX's platform throughout the Class Period. For example, Hayes and Delo allowed some influential users who they knew were U.S. persons to openly access and trade on BitMEX's platform. Hayes, Reed, and Delo admitted in their guilty pleas that they knew BitMEX's platform was utilized by investors located in the United States.

168. BitMEX's only enforcement of its "ban" on U.S. users came from a system that prevented new accounts from being made using a United States IP address. This system, however, could easily be circumvented by using a virtual private network, or "VPN," that nominally conceals a user's location. In fact, BitMEX openly told potential U.S. customers that a VPN could be used to circumvent this restriction. YouTube contains videos of U.S. customers trading on BitMEX, along with instructions on how to access BitMEX from the United States. And the U.S. messaging applications Discord and Telegram have chat groups that instruct U.S. investors to use a VPN to access BitMEX if trading from the United States. BitMEX customer service representative emails and chats reflect regular awareness of the use by U.S. persons of VPN services to access and trade on the BitMEX platform.

169. BitMEX's enforcement of its supposed prohibition on U.S. users ended with the account creation process. Once an account was created, it could be freely accessed from the United States at any time, even though BitMEX had visibility as to what IP address was being used each time an account was accessed, including the location of the user. An account could be created using a VPN that told BitMEX the user was in Hong Kong and then, minutes later, be accessed from an address that BitMEX knew was in New York and used from that address for years and BitMEX would do nothing.

170. As a point of comparison, the system used by the video streaming service Netflix is far more rigorous. Netflix checks the location of the user with every log-in and limits content based on that system. Netflix also actively polices the use of VPNs and bans new ones when it becomes aware of their use, making it difficult for customers to circumvent its location-tracking system. BitMEX, which allowed customers to make highly leveraged trades in complex crypto-

assets, did not employ any of these measures that Netflix uses to regulate access to episodes of *Schitt's Creek*.

171. Even when it was expressly pointed out to BitMEX that a customer was from the United States, BitMEX continued to turn a blind eye to their presence on the platform. If a user forgot his or her password, BitMEX's recovery process would sometimes require them to provide a physical address. If that address was in the United States, BitMEX would allow them to recover their assets and then close the account. But BitMEX would do nothing if that individual used a VPN to open a new account which was then filled with the identical assets and was subsequently accessed from the address of the original user, thus confirming for BitMEX that the United States user had simply moved the assets into a new BitMEX account.

172. BitMEX had the ability to do more, and in fact did so for other jurisdictions. In early 2018, a Canadian regulatory authority in Quebec sent a cease-and-desist letter to BitMEX demanding that it take steps to prevent Canadian users from accessing the platform. After that, BitMEX prohibited any Canadian address from using the platform at all, but failed to do the same for United States users.

173. BitMEX did not want to address these issues because they knew how much profit they were generating from U.S. users. For much of the Class Period, BitMEX actually kept revenue documentation that broke out U.S. users in particular. This documentation showed precisely which trades were from the United States and showed how high a portion of BitMEX's revenues they generated. BitMEX knew that between 20 and 30 percent of all BitMEX users were located in the United States.

174. In fact, BitMEX has actively targeted U.S. users. Defendant Hayes has acknowledged to BitMEX employees that when he appeared on CNBC for an interview there would be a spike in U.S. trading.

175. BitMEX solicits U.S. customers through its "affiliate" program, which allows U.S. customers to solicit other customers to trade on the platform in exchange for compensation from BitMEX. As of July 27, 2018, at least 1,100 U.S. affiliate program customers received affiliate payments from BitMEX for soliciting customers to trade on BitMEX. In 2019, BitMEX paid out $66 million to customers in affiliate commissions.

176. BitMEX's recent so-called reforms illustrate the deficiencies in its prior user verification system. On August 13, 2020—months after the initiation of this litigation—BitMEX announced a new program, the BitMEX User Verification Program, that only went into effect on August 28, 2020. Under this new program, BitMEX requires users to go through a four-step process identification verification program in which users submit photo identification, proof of address, a photograph of themselves, and answer multiple-choice questions. By BitMEX's own description, this program is "similar to ID checks on many other cryptocurrency exchanges"—meaning that, until this action was initiated, and even for several months thereafter, BitMEX's identification verification was below industry standards.

177. BitMEX and its principals' operation of a domestic exchange that ignored legal and regulatory obligations has drawn the attention of U.S. prosecutors and regulators. Recognizing that BitMEX had actively sought to and had in fact served thousands of U.S. customers after its purported withdrawal from the market, federal prosecutors in the Southern District of New York filed an indictment against Defendants Hayes, Delo, Reed, and Dwyer on October 1, 2020, alleging violations of the Bank Secrecy Act. This indictment recognized that BitMEX "has solicited and

accepted offers on its cryptocurrency futures and swaps from customers located in the United States, including individual retail customers" and that "internal BitMEX records reflected thousands of BitMEX accounts with United States location information that were enabled for trading." The indictment also alleged a deliberate attempt to avoid United States regulations by incorporating HDR in the Seychelles because Defendants believed that it would cost less to bribe Seychellois authorities — just "a coconut" as Hayes later bragged—than it would cost to bribe regulators in the United States and elsewhere. Defendants subsequently pleaded guilty in the Southern District of New York to violating the Bank Secrecy Act by willfully failing to establish, implement, and maintain an anti-money laundering program at BitMEX. *See supra* at ¶¶ 66-69.

178. The CFTC filed a civil action on the same day against the Defendants, similarly recognizing that BitMEX solicited and attracted U.S. customers. The CFTC stated that Defendants BitMEX, Hayes, Delo, and Reed had violated the Commodities Exchange Act and CFTC regulations because they "profited while illegally offering leveraged retail commodity transactions, futures, options and swaps; operating as an unregistered futures commission merchant; and operating a facility for the trading of swaps without being registered as a swap execution facility or as a designated contract market." (internal definitions of abbreviations omitted).

179. In addition to this solicitation directed at United States customers, BitMEX also located a substantial portion of its offices and employees in the United States. As described further above, for much of the Class Period, BitMEX personnel conducted BitMEX operations from an office in Manhattan, New York, including customer support, business development, and marketing to customers in the United States. These facts render BitMEX a domestic exchange.

### E. The Class Has Suffered Substantial Damages

180. As a direct result of Defendants' misrepresentations, omissions, and manipulation of the market for their derivative products, including through the use of the server freezes and a hidden internal trading desk to trade against customers and create profitable liquidations and the manipulation of reference exchanges, Plaintiffs and members of the Class have suffered significant actual damages in an amount to be proven at trial.

181. While the precise measurement of the actual damages caused to the Class by Defendants' actions is not calculable at this stage, a partial approximation can be found in the value of the Insurance Fund, which is filled with the profits of Defendants' liquidations. As of January 25, 2021, the Insurance Fund contained 37,318.495 bitcoin, valued at over $1.2 billion.

## V. DEFENDANTS' CONCEALMENT OF THEIR MISCONDUCT PREVENTED PLAINTIFFS AND MEMBERS OF THE CLASS FROM BRINGING A CLAIM AT THE TIME THE EVENTS OCURRED

182. Neither Plaintiffs nor members of the Class were in a position to appreciate the scope of Defendants' manipulative activities at the time those events occurred.

183. Prior to April 30, 2018, Defendants concealed the existence of the Insider Trading Desk that transacted against the interests of their own customers. Before this revelation, Plaintiffs and members of the Class could not reasonably have known that BitMEX was trading against its own customers. Even when this information was revealed, however, BitMEX continued to prevent Plaintiffs and members of the Class from recognizing the existence of the manipulation because it falsely claimed that this desk was only engaging in a market-making function. Key aspects of Defendants' scheme—including BitMEX insiders' ability to trade during freezes, the creation of secret Gmail accounts for use by BitMEX insiders to trade against customers using inside information, and the manipulation of BitMEX's reference exchanges to force liquidation of customer accounts—have become apparent only because of factual and expert research conducted

by Plaintiffs' counsel that could not have been reasonably undertaken by any class member acting alone. Plaintiffs have spoken to former BitMEX employees who have provided details about the creation and operation of the Insider Trading Desk. This information has never before been made public, preventing members of the Class from recognizing their injury.

184. Moreover, Defendants' conduct was, by its nature, self-concealing, and it has taken time and resources for Plaintiffs' counsel to unravel Defendants' schemes.

## VI. CLASS ALLEGATIONS

185. Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23 and seek certification of the following Class: All persons who purchased any Bitcoin or Ethereum swap products on BitMEX in domestic U.S. transactions between February 28, 2016 and an end date to be determined by the Court and were injured thereby. Accordingly, the Class Period is February 28, 2016 through the end date as determined by the Court.

186. Plaintiffs reserve the right to extend the Class Period should they learn, through discovery, that the conduct described above extended back further in time and harmed additional individuals not captured in the current Class Period.

187. Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

188. Plaintiffs reserve the right to amend the Class definition if investigation or discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

189. The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

190. Members of the Class are readily ascertainable and identifiable. Members of the Class may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or its agents. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

191. Plaintiffs' claims are typical of the claims of the Class members, as all members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein. Plaintiffs do not have any interest that conflicts with the interests of the members of the Class.

192. Plaintiffs and members of the Class sustained damages from Defendants' common course of unlawful conduct.

193. Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

194. Plaintiffs also seek declaratory relief for themselves and the Class, asking the Court to declare their purchase agreements with BitMEX void, such that prosecuting separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for BitMEX; and BitMEX has acted on grounds that apply generally to the Class, so that the declaratory relief is appropriate respecting the Class as a whole.

195. Common questions and answers of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including but not limited to the following:

- Whether BitMEX profited through its Insider Trading Desk at the expense of its customers;
- Whether BitMEX intentionally triggered liquidations of its customers, including through its Insider Trading Desk;
- Whether BitMEX caused server freezes and customer lock-outs in order to enable its market manipulation and profit at its customers' expense;
- Whether BitMEX made material omissions regarding the frequency and effect of its server freezes and customer lock-outs;
- Whether BitMEX failed to disclose to its customers the existence and scope of operations of its Insider Trading Desk and otherwise employed a deceptive device and fraudulent course of business;
- Whether BitMEX created secret anonymized accounts that it used to trade against its customers using its full visibility into their profiles;
- Whether BitMEX controlled accounts that were secretly able to trade while regular customers were locked out of the platform;
- Whether BitMEX actively manipulated prices on the reference exchanges, and on BitMEX, in order to profit and to liquidate its own customers;
- Whether BitMEX's customers were harmed by BitMEX's deceptive and manipulative conduct.
- Whether BitMEX is a domestic exchange.

196. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the actual damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

197. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

**Deceptive Device and Fraudulent Course of Business**
**7 U.S.C. §§ 9(1), 25(a)(1)(B), (C)(iv), and Rule 180.1**
**(Against All Defendants)**

198. Plaintiffs incorporate the preceding paragraphs.

199. Section 6(1) of the Commodity Exchange Act ("CEA") in relevant part makes it "unlawful for any person … to use or employ … in connection with any swap, or a contract … for future delivery … any … deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010." 7 U.S.C. § 9(1).

200. Consistent with Section 6(1), the CFTC timely promulgated Rule 180.1, 17 C.F.R. § 180.1, which in relevant part makes it

> unlawful for any person … in connection with any swap … or contract for future delivery … to intentionally or recklessly:
>
> … .
>
> Make … any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> Engage … in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person … .

201. Section 22 of the CEA sets forth a private right of action for a plaintiff who made "any contract of sale of any commodity for future delivery" or "any swap" through a person or entity whose violation of the CEA resulted in actual damages to the plaintiff, 7 U.S.C. § 25(a)(1)(B), or who placed through such person or entity "an order for the purchase or sale of … a swap," *id*. § 25(a)(1)(C)(iv).

202. During the Class Period, Defendants used a deceptive device and fraudulent course of business to benefit themselves at the expense of BitMEX customers by inducing people through

fraudulent representations and omissions to use BitMEX to trade in swaps and/or futures and thereby suffer trading losses to benefit BitMEX at the expense of these customers.

203. The Bitcoin or Ethereum derivative products sold by BitMEX to Plaintiffs and the Class are swaps or contracts for future delivery within the meaning of the CEA and Rule 180.1. In particular, XBTUSD and ETHUSD are swaps within the meaning of the CEA because they are contracts that "provide[] on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more…commodities" that transfer, "in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset." 7 U.S.C. § 1a (47)(A)(iii) (defining "swap").

204. During the Class Period, in connection with Bitcoin or Ethereum derivative products, Defendants used a deceptive device and engaged in a course of business that operated as a fraud and deceit upon BitMEX customers, including by:

a. Operating the Insider Trading Desk without disclosing its existence and then without disclosing the nature and scope of its operations;

b. Using secret, anonymous accounts to trade against BitMEX customers without disclosing those facts to the customers or the market;

c. Granting privileged access to the BitMEX platform to the anonymized accounts, including while customers were locked out, and by misrepresenting that the Insider Trading Desk did not have such access; Triggering automatic liquidations of trading positions through customer lock-outs and the manipulation of prices on reference exchanges and thus on the BitMEX platform, without disclosing those facts;

d. Intentionally or recklessly misrepresenting that Defendants were using and would continue to use commercially reasonable efforts to prevent customer lock-outs on the BitMEX platform; and

e. Intentionally or recklessly failing to disclose the susceptibility of the BitMEX platform to customer lock-outs and their predictable, negative effects on customers and beneficial effect for BitMEX, including through the operation of the Insurance Fund.

205. Defendants thus used a deceptive device and engaged in a fraudulent course of business as part of a scheme in which they also used a manipulative device and engaged in price manipulation in violation of the CEA, as alleged in Counts II and III.

206. Defendants made fraudulent statements and committed fraudulent omissions during the Class Period in at least three main respects.

207. *First*, Defendants made fraudulent statements and committed fraudulent omissions regarding the nature and operations of the Insider Trading Desk.

a. Within the Class Period, and specifically from February 28, 2016, until April 20, 2018, BitMEX fraudulently omitted to disclose that it uses a trading desk to trade against its customers. Where the use of such a trading desk was a central aspect of BitMEX's operations and significantly affected whether and how a reasonable investor could make net gains from his or her trading on BitMEX, in order to make BitMEX's description of its services on its website not misleading, Defendants were obligated to disclose that BitMEX used a trading desk to trade against its customers.

b. Within the Class Period after April 30, 2018, BitMEX updated its terms of service on its website and revealed that "BitMEX has a for-profit trading business that, among other things, transacts in products traded on the BitMEX platform." Defendants did not disclose, however, that the Insider Trading Desk enjoys information and technical advantages over BitMEX customers, described further below, or that the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as also described further below, in order to make its own trades profitable and to force customer liquidations.

c. Given that BitMEX trades against its own customers, a reasonable BitMEX customer would want to know facts bearing on how BitMEX conducts such trades and the extent to which BitMEX is likely to be successful in conducting such trades.

208. Accordingly, in order to make its description of the activity of the Insider Trading Desk not misleading, Defendants were obligated to (but did not) disclose the information and technical advantages that it enjoys over BitMEX customers and the Insider Trading Desk artificially manipulates the prices of bitcoin and ether on the U.S.-based third-party reference exchanges, as also described above, in order to make its own trades profitable and to force customer liquidations. *Second*, Defendants made fraudulent statements and committed fraudulent omissions regarding the nature and scope of the customer lock-outs on BitMEX.

a. Within the Class Period, and specifically from February 28, 2016, to approximately December 2018, BitMEX's website warned customers only

that a customer's own internet service might experience a disruption that prevented the customer from trading on the BitMEX platform.

b. Defendants employed this warning knowing that BitMEX's own server freezes, independent of their customers' internet service, would or would likely prevent customers from trading on the BitMEX platform.

c. Only in early 2019 did BitMEX's website vaguely disclose that undefined system overloads might disrupt access to the BitMEX platform. The website has further stated since that time that the customer lock-outs are a result of technical limitations regarding the volume of trading the platform can accommodate.

d. Defendants did not disclose, however, that any such technical limitations do not restrict the Insider Trading Desk, which remains able to trade against BitMEX customers during the lock-outs.

e. Where BitMEX trades against its own customers, a reasonable BitMEX customer would conclude that a lock-out would suspend all trading on the platform, and the Insider Trading Desk's ability to use the platform during customer lock-outs provided BitMEX with a substantial advantage in trading against BitMEX customers.

f. Accordingly, in order to make its description of the nature and scope of lock-outs not misleading, Defendants were obligated to disclose that the lock-outs do not restrict the Insider Trading Desk.

g. Since early 2019, moreover, referring to the "Services" available on its trading platform, BitMEX has at least recklessly and falsely claimed that it

"shall make reasonable efforts to ensure that the Services are available to you" and that BitMEX "will use commercially reasonable efforts to avoid downtime of the Services during anticipated peak hours."

h. In fact, BitMEX did not intend and has failed to use reasonable or commercially reasonable efforts to avoid customer lock-outs, and in knowingly or recklessly claiming otherwise, BitMEX deceived customers into trading on the platform.

i. Indeed, on information and belief, for the reasons alleged above, Defendants knowingly or recklessly intend the customer lock-outs regularly to occur, in particular during periods of high volatility, to lock out BitMEX customers from their accounts during large market moves in order to increase the number of position liquidations.

j. Accordingly, in order to make their statements about their purported intent to use reasonable or commercially reasonable efforts to avoid such lock-outs not misleading, Defendants were obligated to disclose their intent to use these lock-outs to their advantage.

k. On March 13, 2020, after BitMEX's trading platform was locked out for approximately twenty-five minutes, resulting in the liquidation of $800 million of its customers' highly leveraged positions, BitMEX tweeted the fraudulent misrepresentation that the lock-out had resulted from "a hardware issue with our cloud service provider causing BitMEX requests to be delayed." Defendants knew or recklessly should have known that this statement was false when they made it.

l. Several days later, on March 17, 2020, BitMEX tweeted the fraudulent misrepresentation that "the root cause" of the March 13 lock-out had been "two DDoS attacks," meaning distributed denial-of-service attacks. Defendants knew or recklessly should have known that this statement was false when they made it.

m. The intent and effect of these fraudulent misrepresentations regarding the lock-out on March 13, 2020, was to mislead BitMEX customers and the market into believing that the lock-out was unavoidable and that BitMEX did not know or recklessly fail to know that the lock-out would occur, and thus to induce current and prospective BitMEX customers to use the platform to generate profit for Defendants.

209. *Third*, Defendants made fraudulent statements and committed fraudulent omissions regarding the supposedly "hidden orders" that customers may place on the BitMEX platform.

a. The BitMEX website stated throughout the Class Period that a "Hidden Order" is an order "that is not visible on the public orderbook" and that "Traders use this order type when they don't want to inform the market of their trading intentions."

b. Defendants did not disclose, however, that these orders are not hidden from BitMEX and its insiders, and until April 20, 2018, did not disclose that BitMEX trades against its own customers. BitMEX thus presented a materially false and misleading description of how these orders functioned.

c. A reasonable BitMEX customer would conclude that no one using the BitMEX platform would be able to trade based on the details of a so-called

"hidden" order, and the access to these so-called "hidden" orders provided BitMEX and its insiders with a substantial advantage in trading against BitMEX customers.

d. Accordingly, in order to make its description of a "hidden order" not misleading, Defendants were obligated to disclose that hidden orders were not hidden from BitMEX, and its insiders were obligated to disclose throughout the Class Period that BitMEX trades against its customers with knowledge of the details of the hidden orders.

210. Hayes, Reed, Delo, and Dwyer (the "Individual Defendants"), and HDR and Shine, were part of this scheme from the beginning of the Class Period; ABS joined the scheme on or about April 27, 2017; HDR Services joined the scheme in 2018; and 100x joined the scheme on or about August 15, 2020.

211. Defendants knew of and intentionally perpetuated these misrepresentations and omissions. BitMEX and the Individual Defendants concealed facts that went to the core of BitMEX's operation and profit model and could not reasonably have been unaware of these facts.

212. Defendants intended that the market rely on these misrepresentations and half-truths throughout the Class Period, and the market reasonably did so, given that these statements concerned core aspects of BitMEX's business.

213. Defendants' fraudulent statements and omissions allowed BitMEX to create the false impression that BitMEX was not trading against its own customers; that if BitMEX was trading against its own customers, as it eventually had to admit it was doing, it nevertheless was not doing so with substantial trading advantages over the customers; that BitMEX would not be able to, and would not, take advantage of customer lock-outs to benefit BitMEX at the expense of

customers; and that the prices of bitcoin and ether used to determine the value of Bitcoin and Ethereum derivative products traded on BitMEX were prices that BitMEX had not itself manipulated.

214. With these false impressions established, Defendants were able improperly to attract customers to use the BitMEX platform, to liquidate customer trading positions on BitMEX, to use the Insider Trading Desk to orchestrate disadvantageous trades for BitMEX customers, and to manipulate the price of bitcoin and ether on referenced exchanges to orchestrate further disadvantageous trades and position liquidations for BitMEX customers.

215. Defendants generated ill-gotten gain from their fraud by collecting fees from trading on the BitMEX platform that occurred as a result of the fraud (where customers would not have used the platform if they had known the truth); prevailing as the counterparty against customers with respect to trading that occurred as a result of the fraud (where customers would not have used the platform or traded as they did if they had known the truth); and increasing the size of the Insurance Fund through position liquidations that occurred as a result of the fraud (where customers would not have used the platform or traded as they did if they had known the truth).

216. The increasing size of the Insurance Fund, in turn, induced current and potential BitMEX customers to use the platform and thereby generate further fees for BitMEX, winning trades for BitMEX, and liquidations of trading positions, in a repeating cycle of ill-gotten gains for Defendants and harm to Plaintiffs and the Class.

217. Defendants' fraud was thus a direct and proximate cause of the injury to Plaintiffs and the Class during the Class Period in that Plaintiffs and the Class traded in swaps and/or futures on margin on BitMEX as they did, and thus paid the fees and suffered their net losses from such trading, as a result of their reasonable failure to know the actual facts.

218. Defendants' fraud was also a direct and proximate cause of the injury to Plaintiffs and the Class during the Class Period in that Plaintiffs and the Class traded in swaps and/or futures on margin on BitMEX as they did based on their misunderstanding of the value of bitcoin and ether as reflected on the U.S.-based third-party reference exchanges, and thus suffered the net losses they suffered as a result of their trading and their reasonable failure to know the actual facts.

219. It was a foreseeable and natural consequence of the purposes and goals of Defendants' use of a deceptive device and engagement in a fraudulent course of business, as described above, that Plaintiffs and the Class would pay the fees they paid and suffer the net losses they suffered, and that Defendants would generate the ill-gotten gains they did.

220. Defendants employed these deceptive devices and contrivances during the Class Period from Defendants' offices in New York, New York; San Francisco, California; and Milwaukee, Wisconsin, to the computer servers of U.S.-based third-party reference exchanges. During the Class Period, Plaintiffs and the Class members thus made and placed through BitMEX Bitcoin and Ethereum derivative products, including the swaps XBTUSD and ETHUSD, and suffered actual damages from such trading as a result of Defendants' violation of the CEA and of Rule 180.1. Plaintiffs and the Class purchased derivative swap products from and through BitMEX because of the untrue and misleading statements and omissions and a practice and course of business that operated as a fraud and deceit upon BitMEX customers. Because Defendants were secretly trading against Plaintiffs and the Class while exploiting undisclosed advantages to liquidate their positions and profit BitMEX, Plaintiffs and the Class were damaged by Defendants' deceptive conduct.

## SECOND CAUSE OF ACTION

**Manipulative Device and Contrivance**
**7 U.S.C. §§ 9(1), 25(a)(1)(D)(i) and Rule 180.1**
**(Against All Defendants)**

221. Plaintiffs incorporate the preceding paragraphs.

222. Section 6(1) of the CEA, referring to the CFTC, in relevant part makes it "unlawful for any person … to use or employ … in connection with any swap, or a contract … for future delivery, … any manipulative … device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010." 7 U.S.C. § 9(1).

223. Consistent with Section 6(1), the CFTC timely promulgated Rule 180.1, which in relevant part makes it "unlawful for any person, directly or indirectly, in connection with any swap… or contract for future delivery … to intentionally or recklessly … [u]se or employ … any manipulative device, scheme, or artifice to defraud." 17 C.F.R. § 180.1.

224. Section 22 of the CEA in relevant part sets forth a private right of action for a plaintiff whose actual damages resulted from a person or entity's "use or employment of … , in connection with a swap, … any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010." 7 U.S.C. § 25(a)(1)(D)(i).

225. The Bitcoin or Ethereum derivative products sold by BitMEX to Plaintiffs and the Class are swaps or contracts for future delivery within the meaning of the CEA and Rule 180.1, and XBTUSD and ETHUSD are swaps within the meaning of the CEA. See supra ⁋ 203.

226. During the Class Period, Defendants employed manipulative devices or contrivances at the expense of Plaintiffs and the Class by manipulating the prices of the Bitcoin

and Ethereum derivative products to profit themselves, including by inducing liquidations that BitMEX knew would be profitable to itself.

227. Defendants' undisclosed Insider Trading Desk had special access to hidden customer information and priority access to trading queues. Defendants combined these undisclosed and unlawful advantages with algorithmic tools that would display in real time which price movements would cause the greatest number of profitable liquidations for BitMEX. Defendants would then use their Insider Trading Desk to place orders that would move the market, harming customers and profiting themselves.

228. Defendants further employed manipulative devices by inducing artificial prices and price movements on U.S.-based third-party reference exchanges, including Coinbase, Bitstamp, and Kraken, and using such price movements to force liquidations of customer swap and futures positions on BitMEX, including during customer lock-outs caused by server freezes while the Insider Trading Desk was not locked out. Defendants deposited into the Insurance Fund a portion of the funds they confiscated through these liquidations.

229. During the Class Period, Defendants transmitted orders to U.S.-based third-party reference exchanges to manipulate the price of bitcoin and ether with the purpose of misleading BitMEX customers and the market into believing, incorrectly, that the prices on such third-party exchanges were the result of natural market forces of supply and demand.

230. Defendants used these third-party exchanges in this way because at least two of them, Bitstamp and Kraken, were thinly traded and illiquid spot-market exchanges on which relatively small market orders could and would cause relatively large price movements.

231. On information and belief derived from quantitative analysis conducted by experts on behalf of Plaintiffs, Defendants executed at least the following forms of price manipulation on those exchanges:

a. *Pump and Dumps*. Defendants would use orders on reference exchanges to purchase bitcoin or ether in sufficient volume to artificially inflate the prices of these commodities to a given threshold by falsely conveying to the market demand for them, and then sell those commodities at the artificially inflated price, realizing ill-gotten gain and causing the prices of the commodities to drop significantly, leaving those who bought the commodities during the "pump" with an asset worth significantly less than the price they paid for it. This form of manipulation also sometimes caused the liquidation of customer swap and futures positions on BitMEX.

b. *Stop-Loss Hunting*. Defendants would use the orders to purchase bitcoin or ether in sufficient volume to move the price of these commodities to the price level at which many BitMEX swap and futures customers had set a stop-loss order, or "Stop-Limit Order," which are orders set to automatically execute if the price of a given commodity reaches a certain threshold. This automatic execution of many orders may cause the price of the commodity to move even further, resulting in a cascade of stop-loss orders. BitMEX would trade against its customers to benefit from these automatically executed orders.

c. *Liquidation Cascades*. Defendants would use the orders to purchase bitcoin or ether in sufficient volume to move the price of these commodities to a

price level at which the positions of many BitMEX swap and futures customers would be liquidated, to the benefit of Defendants through the increasing Insurance Fund, which liquidations would move the price level even further and cause even further swap and futures liquidations.

232. Defendants benefitted from these forms of price manipulation by, among other things, forcing artificial liquidations that increased the size of the BitMEX Insurance Fund.

233. Defendants thus employed manipulative devices and contrivances during the Class Period as part of a deceptive device and fraudulent course of business, as alleged in Count I, and as part of a scheme in which they engaged in price manipulation in violation of the CEA, as alleged in Count III.

234. Defendants employed these manipulative devices and contrivances during the Class Period from Defendants' offices in New York, New York; San Francisco, California; and Milwaukee, Wisconsin, to the computer servers of U.S.-based third-party reference exchanges.

235. Because of Defendants' manipulation both on BitMEX itself and on the reference exchanges, the prices of the Bitcoin or Ethereum derivative swap products on BitMEX were artificial throughout the Class Period. These prices were consistently and persistently artificial because they had been manipulated by Defendants' use of manipulative devices and contrivances both on their platform and on reference exchanges.

236. At the time of Defendants' forgoing acts, Plaintiffs and reasonable investors were unaware of Defendants' manipulative conduct and reasonably, but incorrectly, believed that natural market forces of supply and demand had created the market conditions they perceived when trading in Bitcoin and Ethereum derivative products.

237. At the time of Defendants' forgoing acts, which were intended to mislead and defraud, Plaintiffs and investors reasonably did not know of Defendants' undisclosed intentions and goals, and in the exercise of reasonable diligence they could not have discovered Defendants' undisclosed intentions and goals.

238. Plaintiffs' and investors' reliance on the market conditions they perceived when trading on the BitMEX platform was justified in that they reasonably concluded that they were trading only against other BitMEX customers, and that the prices of Bitcoin and Ethereum derivative products on BitMEX reflected market conditions because they relied on U.S.-based third-party reference exchanges, unaffiliated with BitMEX. Plaintiffs and members of the Class could not have known that they were in fact trading in a market containing BitMEX employees benefitting from undisclosed advantages and subject to price manipulation both on BitMEX and on reference exchanges.

239. Defendants' market manipulation deprived Plaintiffs and the Class of a lawfully operating market during the Class Period and created persistently artificial prices. The market relied on Defendants' market manipulation in that they reasonably did not understand that BitMEX was deliberately causing artificial price movements throughout the Class Period through trading both on its own platform and on the U.S.-based third-party reference exchanges with the intent to create liquidations that would profit BitMEX.

240. During the Class Period, in which Defendants persistently manipulated the prices on BitMEX for Bitcoin and Ethereum derivative swap products, Plaintiffs and the Class transacted in Bitcoin or Ethereum derivative swap products on the BitMEX platform at artificial and unlawful prices resulting from Defendants' misconduct, suffered losses as a result of disadvantageous

trades, and were subject to liquidations because of these artificial prices, and as a direct result thereof suffered actual damages.

241. Plaintiffs and the Class would not have traded on the BitMEX platform, and thus paid the fees and suffered their net losses from such trading, if they had known the actual facts.

242. Defendants were fully aware of and intended these price manipulations. Defendants specifically sought and secured the creation of the technical system that gave the Insider Trading Desk its advantages and controlled the manipulation of prices on the reference exchange. Defendants' manipulation was designed to and did in fact create persistently artificial prices for Bitcoin and Ethereum derivative swap products on BitMEX.

243. During the Class Period, Plaintiffs and the Class members thus entered into Bitcoin and Ethereum derivative swap products, including XBTUSD and ETHUSD, through BitMEX and suffered actual damages from such swaps and futures as a result of Defendants' use or employment, in connection with the swaps and/or futures, of a manipulative device and contrivance in violation of the CEA and Rule 180.1.

## THIRD CAUSE OF ACTION

**Price Manipulation**
**7 U.S.C. §§ 9(3), 25(a)(1)(D)(ii)**
**(Against All Defendants)**

244. Plaintiffs incorporate the preceding paragraphs.

245. Section 6(3) of the CEA states in relevant part that "it shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity." 7 U.S.C. § 9(3). Section 22(a)(1)(D)(ii) of the CEA, referring back to Section 22(a)(1)(D)(i), makes unlawful the "manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap." 7 U.S.C. § 25(a)(1)(D)(ii).

246. The Bitcoin or Ethereum derivative swap products sold by BitMEX to Plaintiffs and the Class are swaps or contracts for future delivery within the meaning of the CEA. In particular, XBTUSD and ETHUSD are swaps within the meaning of the CEA. *See supra* ⁋ 203.

247. During the Class Period, Defendants created persistently artificial prices for their Bitcoin and Ethereum derivative swap products. Defendants persistently and regularly engaged in trading on their own platform and on U.S.-based third-party reference exchanges, including Coinbase, Bitstamp, and Kraken, that was designed to and did manipulate prices of these Bitcoin and Ethereum derivative swap products in order to cause liquidations and profit Defendants.

248. Defendants' undisclosed Insider Trading Desk had special access to hidden customer information and priority access to trading queues. Defendants combined these undisclosed and unlawful advantages with algorithmic tools that would display in real time which price movements would cause the greatest number of profitable liquidations for BitMEX. Defendants would then use their Insider Trading Desk to place orders that would move the market, harming customers and profiting themselves.

249. Defendants further manipulated prices of their derivative products by inducing artificial prices and price movements for Bitcoin and Ether on U.S.-based third-party reference exchanges, including Coinbase, Bitstamp, and Kraken, and using such price movements to force liquidations of customer swap and futures positions on BitMEX, including during customer lock-outs while the Insider Trading Desk was not locked out. Defendants deposited into the Insurance Fund a portion of the funds they confiscated through these liquidations.

250. During the Class Period, Defendants manipulated U.S.-based third-party reference exchanges and thus caused artificial prices on the BitMEX platform because, as alleged above, some of these third-party exchanges were relatively thinly traded exchanges on which relatively

small market orders would cause relatively large price movements; Defendants in fact traded sufficient volumes of bitcoin and ether on these exchanges to cause price movements; and the prices of bitcoin and ether on BitMEX for Bitcoin and Ethereum derivative swap products was directly tied to the prices on these third-party exchanges.

251. During the Class Period, Defendants specifically intended to cause artificial prices for Bitcoin and Ethereum derivative swap products on the BitMEX platform. Defendants thus acted with the purpose and conscious objective of causing and affecting prices that did not reflect the legitimate forces of supply and demand.

252. Defendants possessed the motive and opportunity to cause these artificial prices because they would benefit from them, profiting from both disadvantageous trades for BitMEX customers and from liquidations of customer trading positions resulting from these price movements, and because Defendants possessed sufficient amounts of bitcoin and ether to cause such price movements.

253. Strong circumstantial evidence of Defendants' conscious misbehavior exists in that, among other such evidence, BitMEX has admitted to trading against its customers for financial advantage, and large trades on the U.S.-based third-party reference exchanges, in volumes of bitcoin and ether that the overwhelming majority of traders did not use to trade, frequently caused BitMEX immediately to benefit from the resulting price movements.

254. Defendants manipulated prices during the Class Period from Defendants' offices in New York, New York; San Francisco, California; and Milwaukee, Wisconsin, to the computer servers of U.S.-based third-party reference exchanges.

255. During the Class Period, in which Defendants persistently manipulated prices of their Bitcoin and Ethereum derivative swap products, Plaintiffs and the Class transacted in these

derivatives on the BitMEX platform at persistently artificial prices resulting from Defendants' misconduct, suffered losses as a result of disadvantageous trade, and were subject to liquidations because of these persistently artificial prices, and as a direct result thereof suffered actual damages.

256. During the Class Period, Plaintiffs and the Class members thus entered into swaps and/or futures through BitMEX, including the swaps XBTUSD and ETHUSD, and suffered actual damages from such swaps and futures as a result of, in connection with the swaps and futures, Defendants' manipulation of the price of derivatives of Bitcoin and Ethereum offered on BitMEX, in violation of the CEA.

## FOURTH CAUSE OF ACTION

**Principal-Agent Liability 7 U.S.C. § 2(a)(1)(B)**
**(Against HDR, Shine, ABS, ADR Services, and 100x)**

257. Plaintiffs reallege the allegations above.

258. The CEA provides in relevant part that the "act, omission, or failure of any … agent, or other person acting for any … corporation … within the scope of his employment or office shall be deemed the act, omission, or failure of such … corporation … as well as of such … agent, or other person." 7 U.S.C. § 2(a)(1)(B).

259. Each of Defendants HDR, Shine, ABS, ADR Services, and 100x (the "Corporate Defendants") is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the fraudulent and manipulative acts of its agents, representatives, or other persons acting for it in the scope of their employment with the corporate entity.

260. The deceptive device and fraudulent course of business at issue in Count I, and the manipulative device and contrivance and price manipulation at issue in Counts II and III, respectively, all involved the Individual Defendants' ownership and control over, and positions as officers and directors of, the Corporate Defendants. During the Class Period:

a. HDR owned the trading platform called BitMEX and operated BitMEX out of an office in New York, New York. In July 2020, HDR was restructured to be a subsidiary of 100x.

b. ABS was registered to do business in New York and was responsible for technical aspects of the BitMEX platform, including security services and implementing the user interface that traders use to buy and sell products.

c. Starting on or about August 15, 2020, 100x was a holding company for HDR and its assets, including the BitMEX trading platform.

d. HDR Services employed personnel performing duties for BitMEX. This personnel operated out of a Bermuda office and provided contract-based services to HDR.

e. Shine was a subsidiary of HDR, a subsidiary of 100x beginning on or about August 15, 2020, and the entity through which BitMEX conducted trading, both on its own platform and on other exchanges.

261. The Individual Defendants, as alleged below, maintained distinct responsibilities with respect to the BitMEX trading platform and various operations during the Class Period. Defendants, within the time ranges set forth above, all participated in the employment of a deceptive device and fraudulent course of business, employment of a manipulative device, and price manipulation. HDR and ABS operated as alter egos of each other for purposes of operating the BitMEX trading platform, in that HDR controlled and funded ABS's operations and used ABS's offices to manage BitMEX's engineering, security, and back office.

262. During the Class Period, the Individual Defendants were controlling directors, shareholders or employees of the Corporate Defendants.

263. The Individual Defendants directly or through officers, directors, and employees of the Corporate Defendants, oversaw the employment of a deceptive device and fraudulent course of business, employment of a manipulative device, and price manipulation. Hayes, Reed, and Delo in particular controlled the operations of BitMEX and its trading platform, with Dwyer leading the operation of the Insider Trading Desk.

264. Each of Hayes, Reed, Delo, and Dwyer knew of and participated in the employment of a deceptive device and fraudulent course of business, employment of a manipulative device, and price manipulation.

265. Since at least 2017, as the CFTC has alleged:

> Hayes, Delo, and Reed have controlled the BitMEX common enterprise, including the various corporate entities that comprise BitMEX for the common purpose of operating the BitMEX trading facility. Hayes, Delo, and Reed each sign documents on behalf of the various BitMEX corporate entities. They control the bank and trading accounts for the various BitMEX corporate entities. They have the authority to hire and fire employees.

*CFTC v. HDR Global Trading Ltd.*, Complaint ¶ 63 (S.D.N.Y. Oct. 1, 2020). These individuals "ultimately control the deposits to and withdrawals from the BitMEX platform." *Id.*

266. As the CFTC goes on to allege regarding the respective responsibilities and activities of Hayes, Delo, and Reed:

> Hayes, Delo, and Reed have shared responsibility for various aspects of the BitMEX business. At a high level, Delo has been responsible for building and overseeing the BitMEX trading engine, Reed has been responsible for building and overseeing the BitMEX website, API and order entry system, and Hayes has been responsible for strategic decisions, business development, marketing, and management of the BitMEX enterprise. Hayes has also been primarily responsible for representing BitMEX in public speaking engagements and appearances, and has authored many of the posts on the BitMEX blog. Hayes regularly appears as a speaker at conferences throughout the world, including in the U.S. on behalf of BitMEX.

*Id*. ¶ 69. "Hayes, Delo, and Reed have worked together to build the BitMEX platform, and all have been involved in the critical decisions for the enterprise." *Id*. ¶ 70.

267. As the CFTC further alleges, "Hayes, Delo, and Reed have made decisions on BitMEX's products, including deciding how to structure BitMEX's futures, options and swaps contracts," and with reference to the Insider Trading Desk, they "also have been involved with developing and managing BitMEX's internal market maker trading algorithms." *Id*. ¶ 72.

268. The Corporate Defendants helped to employ a deceptive device and fraudulent course of business, manipulative device, and price manipulation by acting as a single, integrated, common corporate undertaking. As the CFTC has alleged:

> They share common office space, employees and operational resources. They advertise on a single website that does not distinguish between entities. They share common directors. They share common ownership. They share common legal and compliance resources. They share operating expenses, and report financial activities in consolidated financial statements. BitMEX employees and executives refer to a BitMEX enterprise as opposed to distinguishing between legal entities. Employees of the various entities have "bitmex.com" email addresses.

*CFTC* Complaint ¶ 15. "These entities operate as an integrated, common enterprise." *Id.*

269. In March 2018, Hayes in effect admitted that the Corporate Defendants operate as a single, consolidated corporate entity, referring in a circulated monthly report to these entities as constituting "the entire company," and to meetings among the employees of these entities as a chance to meet "as a company."

270. Defendants employed their deceptive device and fraudulent course of business, manipulative device, and price manipulation in significant part through their presence in the United States. An April 2017 Service Agreement between HDR and ABS, for example, "renders ABS staff contractually responsible for BitMEX's business development, marketing, sales, engineering,

human resources, payroll, customer support and software development from its U.S. offices in San Francisco and New York." *Id.* ¶ 53.

271. Since 2017, at least the following functions have been performed from BitMEX's office in San Francisco: "Product Engineering, Incident Response, and Software and Security Engineering, Product Management, User Experience/Visual Design/UX, Dev Ops Engineering, Data Engineering, Kubernetes Engineering, Web Development, Human Resources, Ventures, Security and IT, Communications, Marketing, Accounting, and Recruiting." *Id.* ¶ 55.

272. Until April 2019, HDR maintained addresses in San Francisco at 301 Battery Street, 340 Brannan Street, and 2 Embarcadero Center. In April 2019, HDR closed its other U.S. offices and centered its U.S. personnel into one San Francisco office.

273. Consistent with Plaintiffs' allegations herein, moreover, the CFTC has concluded that "BitMEX has devoted significant resources to soliciting customers in the U.S. BitMEX solicits orders from U.S.-based customers for futures, options, and swaps by advertising on its website and on social media, including the BitMEX blog, Twitter, Reddit, Telegram, Facebook and a BitMEX YouTube page." *Id.* ¶ 74.

274. During the Class Period, Plaintiffs and the Class members suffered actual damages from the Individual Defendants' misconduct, within the scope of their employment and offices with the Corporate Defendants, in violation of the CEA.

## <u>FIFTH CAUSE OF ACTION</u>

### Aiding and Abetting
### 7 U.S.C. § 13c(a)
### (Against the Individual Defendants)

275. Plaintiffs reallege the allegations above.

276. The CEA provides in relevant part:

> Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concern with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

7 U.S.C. § 13c(a). This provision thus applies to the extent that any Defendant is not liable as a principal, as alleged in Counts I, II, and III.

277. The Individual Defendants knowingly aided, abetted, counseled, induced and procured the violations of the CEA alleged herein.

278. The Individual Defendants did so knowing of the Corporate Defendants' fraudulent scheme, use of a manipulative device and contrivance, and price manipulation, in violation of Sections 6(1), 13(a) and 22(a)(1) of the CEA.

279. During the Class Period, Plaintiffs and the Class members suffered actual damages from the Corporate Defendants' misconduct, which the Individual Defendants aided and abetted, in violation of the CEA.

## PRAYER FOR RELIEF

280. On behalf of themselves and the Class, Plaintiffs request relief as follows:

a. That the Court determines that this action may be maintained as a class action, that Plaintiffs be named as Class Representatives of the Class, that the undersigned be named as Lead Class Counsel of the Class, and that notice of this action be given to Class members;

b. That the Court enter an order declaring that Defendants' actions, as set forth in this Amended Complaint, violate the federal laws and regulations set forth above;

c. That the Court award Plaintiffs and the Class actual damages in an amount to be determined at trial, with Defendants jointly and severally liable;

d. That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiffs and the Class are entitled, including a declaration that the purchase agreements between each member of the Class and BitMEX are void;

e. That the Court award Plaintiffs and the Class pre- and post-judgment interest;

f. That the Court award Plaintiffs and the Class their reasonable attorneys' fees and costs of suit; and

g. That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

**JURY TRIAL**

281. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury for all claims.

Dated: New York, NY
October 7, 2024

Respectfully submitted,

SELENDY GAY PLLC

By: /s/ *Jordan A. Goldstein*

Jordan A. Goldstein
Oscar Shine
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
jgoldstein@selendygay.com
oshine@selendygay.com

*Interim Class Counsel*